**Peggy JENKINS, Plaintiff–Appellant,**

v.

**Moody BRYLES, Director, Poplar Bluff Regional Center; Poplar Bluff Regional Center; Department of Mental Health, State of Missouri; Personnel Advisory Board, Defendants–Respondents.**

No. 16744.

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 15, 1991.

Wallace L. Duncan, Duncan & Blaich, Poplar Bluff, for plaintiff-appellant.

William L. Webster, Atty. Gen., Cynthia Harcourt–Hearring, Asst. Atty. Gen., Jefferson City, for defendant-respondent Dept. of Mental Health.

PARRISH, Presiding Judge.

Peggy Jenkins (appellant) was employed at the Poplar Bluff Regional Center, an agency of the Missouri Department of Mental Health. She was dismissed from that employment on December 24, 1987, for actions "considered to be physical abuse of [a] client." Appellant first appealed her dismissal to the Missouri Personnel Advisory Board (hereafter sometimes referred to as "board"). § 36.390.5.[1] The board approved and sustained appellant's dismissal. Appellant then filed a petition for judicial review in the Circuit Court of Butler County. § 536.110. The circuit court affirmed the decision of the board. This is an appeal of that judgment. § 536.140.6. This court reverses and orders that appellant be reinstated to her previous employment and that she receive any and all salaries and benefits that would have accrued from and after December 24, 1987.

1. References to statutes are to RSMo 1986.

Appellate review of this case is directed to the findings and decisions of the Personnel Advisory Board. *Fujita v. Jeffries*, 714 S.W.2d 202, 204 (Mo.App.1986); *Holt v. Personnel Advisory Bd.*, 679 S.W.2d 340, 342 (Mo.App.1984). It is undertaken in accordance with the directives of § 536.140. *Id.*

The incident that was the basis for appellant's dismissal occurred during a time when appellant was combing and applying moisturizer and conditioner to the hair of a resident of the Poplar Bluff Regional Center. The resident's name was Kalinda. Appellant first worked alone with Kalinda. Kalinda was seated at a dining room table. When appellant began applying the moisturizer to Kalinda's hair, Kalinda grabbed for the bottle that contained the moisturizer. Appellant sat the bottle across the table where she believed Kalinda could not reach it. Kalinda pushed her chair back, pushed the table, and grabbed for the bottle. Appellant and Kalinda took hold of the bottle at the same time. Kalinda twisted and pulled causing the top of the bottle to come off. Moisturizer spilled from the bottle onto the floor, the wall, and a corner of the table. Both appellant and Kalinda had moisturizer on their hands. Two other employees, Melba Garver and Jeannie Hamann, came to assist. Melba and Jeannie then held Kalinda in her chair so that appellant could apply the moisturizer. Kalinda put her hands to her face during the conflict. Jeannie and Melba had to pull Kalinda's hands down from her face and hold her arms on the chair. A supervisor, Wanda Branscum, was in the same room doing other things.

The controversy that led to appellant's dismissal arose from a report made by Melba five days after the incident occurred, notwithstanding the existence of a policy that required incidents of this nature to be reported within 24 hours.[2] The report was made December 10, 1987, to a supervisor. Melba later testified in the hearing before the board that Kalinda had grabbed the moisturizer appellant was using, "dumped it, took the lid off real quick and dumped it." She testified that Kalinda was grabbing at appellant and that she and Jeannie came from the kitchen to help appellant; that they set Kalinda back into the chair and held Kalinda there. She testified that appellant "scooped the moisturizer up off of the table and smeared it on Kalinda's face" and said, "Do you want to wear it?" At that time, according to Melba, Jeannie was standing behind Kalinda.

Jeannie Hamann testified that she and Melba went to appellant's aid when Kalinda became aggressive while appellant was grooming Kalinda's hair. Jeannie told about Kalinda reaching across the table and knocking the bottle of moisturizer from the table. Jeannie stated that she put her hands on Kalinda's shoulders from behind. Melba was on the other side of Kalinda. Jeannie also acknowledged that Wanda was in the same room. Jeannie testified that after Kalinda knocked the moisturizer over "[s]he was still very aggressive and she was putting her hands up and [appellant] had her hands up and their hands were on her face and when their hands were away from her face where we could see her face, it had the solution on her face." She testified that Kalinda covered her face with her hands. Jeannie was asked, "Is it more like a hiding type of motion?" She answered, "Yes."

Jeannie was asked the following questions and gave the following answers:

Q. Were you concerned at all about the moisturizer being on Kalinda's face?

A. Yes.

Q. Why were you concerned about it?

A. I was afraid of it getting in her eyes.

Q. Did you say anything?

---

2. Appellant challenged the credibility of Melba in the hearing before the board. Between the time the incident with Kalinda occurred and the time Melba reported that incident, a supervisor confronted Melba about taking excessive breaks while at work. Appellant had told the supervisor who confronted Melba about the excessive breaks Melba was taking, and Melba was aware that appellant was the one who reported her. The board, however, accepted the facts as related by Melba regarding appellant's conduct in caring for Kalinda. In its review of this case, this court defers to the board with respect to the issue of credibility of the witnesses who testified at its hearing. *Edmonds v. McNeal*, 596 S.W.2d 403, 407–8 (Mo. banc 1980).

A. When we saw the moisturizer on her face then Melba asked for a wash cloth and nobody brought it and somebody said something to the effect of her wearing it. I thought that it was [appellant] that said it. Somebody said it.

Q. Wearing it in what manner, what do you mean by the statement?

A. They didn't bring us a wash cloth and then Kalinda tried to put her hands back up to her face and I turned and looked over my shoulder to Wanda and I said, "She's going to get it in her eyes."

And Wanda said, "It won't hurt her."

Q. Did anyone get a wash cloth to wipe off her face?

A. No.

Q. So you did not see anybody wipe off Kalinda's face?

A. No, I didn't.

Wanda Branscum testified at the hearing before the board. She recalled being present in the room when Kalinda was being groomed. "But as far as watching the details and them doing the grooming, I was busy doing other things. I was not observing, you know, the complete procedure of the good grooming." She did recall "seeing the three ladies working with Kalinda, combing her hair, and there was some activity going on which whenever you deal with Kalinda and you comb her hair, you do have." She explained that Kalinda does not like to have her hair done. She did not recall anyone asking her for a towel or a wash cloth. She recalled someone saying, "Don't let it get in her eyes," and asking, "Did she get it in her eyes?" Someone answered, "No."

Appellant testified that she had worked with Kalinda 18 months. She described her experiences with Kalinda. "There was no problem with Kalinda. She would come up and hug you one minute, and she may come flying at you with both hands the next minute. You couldn't pinpoint your relationship with Kalinda."

On December 5 appellant was told that Kalinda's hair needed to be done. Appellant testified that she called Kalinda to the dining room and that Kalinda's behavior was good. According to appellant, when she began applying moisturizer to Kalinda's hair, Kalinda lunged and grabbed for the bottle that contained the moisturizer. Both appellant and Kalinda had hold of the bottle. Kalinda's twisting and pulling at the bottle caused its top to come off. The moisturizer was slung from the bottle hitting the floor, the wall, and the corner of the table. Appellant was asked, "Did any of it get on you?" She answered, "Yes, on both of our hands, you know, when it came open." According to appellant, no other staff member was present at that time. Melba and Jeannie did not arrive until after the moisturizer had spilled.

Appellant further testified:

Q. So what happened then after they came onto the scene?

A. Well, when they came up from behind, Melba was on the left side and Jeannie walked up from behind. Kalinda was still, you know, reached over the table and they proceeded to pull her back and sat her down in the chair that she was originally setting in.

Q. Now, at this time had you attempted to apply any moisturizer on Kalinda?

A. Yes. At one time I had tried, but she started, you know, wanting to reach up and get the bottle. So I sat it over there out of her reach.

Q. Okay. Were you able to get any of it on her hair?

A. Very little.

Q. Okay. Do you recall if any of it got on her face at that particular time?

A. Well, with the spray bottle, it covered such a big area which you know we had not been previously using a spray bottle. We had been applying it with our hands. We just had a squirt bottle that the moisturizer came in and we were squirting it in our hands and rubbing it in like this.

And you know I assumed that Kalinda was either frightened by the spray or was not used to the spray bottle being used and I think that's what made her react as she did.

Q. Okay. Now, let me go back to where we were. When Melba and Jean-

nie came over to help you, I want you to go from there. They came over to assist, and then what happened after they came over?

A. Well, they sat Kalinda down, you know. I took the moisturizer that was on my hands and I assured that it got into her hair because it was really important that she get it. And while they were there holding her and what I had on my hands I proceeded to put into the short hairs around her face and on her hair to assure that she did get it applied while they were standing there.

Q. And what was Kalinda doing at this time?

A. When they were holding her, she was just wiggling around and squirming. But when, before they come in to, before they could get ahold of her, Kalinda is really strong and they had to force her hands down from her face to bring her arms back down to the chair so they could hold her because, you know, it's documented by the psychologist that Kalinda does have a habit of doing this over her eyes and she really holds tightly, you know, and you have to sometimes hold her hands away from her face to hold her down.

Q. So were her hands up to her face when Melba and Jeannie arrived?

A. Yes, uh-huh.

Q. And they helped pull them down?

A. Uh-huh. Set her down in the chair.

Q. All right. Do you recall anyone making a statement at that time as expressing a concern that Kalinda might get moisturizer in her eyes?

A. No.

Appellant said that she got a kitchen towel after the moisturizer had been applied to Kalinda's hair and wiped Kalinda's face and neck. She explained that the moisturizer frequently runs down the cheek of a person to whom it is applied. She stated that she did not remember whether Melba or Jeannie asked Wanda to get a towel. She did not recall making any statement to Kalinda about wearing the moisturizer. Appellant was asked if, at any time, she smeared moisturizer into Ka-

linda's face. She answered, "Definitely not."

The board's written Findings of Fact were as follows.

1. Peggy Jenkins, Appellant, was employed as a Hospital Attendant I on December 30, 1985. At the time of her dismissal she was employed as a Developmental Assistant I and had a monthly salary of $968.

2. Appellant was notified of her dismissal by letter dated December 17, 1987. This letter advised Appellant of her dismissal effective December 24, 1987, and gave Appellant an opportunity to respond to the charges contained therein prior to the effective date.

3. The reason given for the dismissal was physical abuse of a client.

4. The Board finds that on December 5, 1987, while the Appellant was attempting to comb a client's hair and treat the client's hair with a moisturizer, the client knocked over the bottle of moisturizer, dumping it onto the table and floor.

5. Appellant was observed to take moisturizer on her hands and smear it onto the client's face.

6. The Board finds that the Appellant did perform these actions alleged and that they constitute physical abuse of a client.

The Findings of Fact were followed by Conclusions of Law that state, as pertinent to the issues presented by this appeal:

.     .     .     .     .

3. The Board, having found that the Appellant physically abused a client at a state institution on December 5, 1987, now concludes that her dismissal was for good cause.

4. The Appointing Authority's action in dismissing the Appellant from her employment was for the good of the service.

5. The Board, having found that the Appointing Authority did support its charge made against the Appellant in this matter, further concludes that the dismissal of Appellant should be approved.

Appellant raises two points on appeal. The second point is determinative of the appeal. Only that point will be discussed. Appellant alleges that error was committed because the Personnel Advisory Board misdeclared and misapplied the law to the facts in appellant's case. This court's attention is focused upon the evidence relied upon by the Personnel Advisory Board in reaching its Findings of Fact and Conclusions of Law. *Downs v. Personnel Advisory Bd.*, 671 S.W.2d 12, 15 (Mo.App.1984). "[I]t is incumbent upon this court to take a hard look at the transcript of the proceedings before the Personnel Advisory Board." *Id.*

The board found that appellant was notified of her dismissal by letter dated December 17, 1987, stating the reason for her dismissal as physical abuse of a client; that the conduct that constituted physical abuse was appellant's taking moisturizer that had been dumped onto a table and floor by the client and smearing the moisturizer onto the client's face. Appellant was given a letter of dismissal dated December 17, 1987. The board found that the letter of dismissal met the requirement that, in administering discipline, "the Appointing Authority must set forth in writing the reasons for such discipline and give a copy of same to the employee." The board concluded that "having found that the Appellant physically abused a client at a state institution on December 5, 1987," appellant's dismissal was for good cause.

The letter of dismissal stated:

The specific reason for your dismissal is that on the morning of Saturday, December 5, 1987, a resident of Group Home 2501 was asked by you to sit at the dining room table so that you could do her hair. This client, it is indicated, does not like to have her hair combed. She grabbed the spray bottle with the moisturizer in it, took the lid off, and poured the moisturizer on the table and floor. You were reportedly being assisted by two other employees who were holding the client's arms so you could continue combing her hair. It is reported that you removed some moisturizer from the table into your hand and wiped it on the client's face. The investigation conducted by the Board of Inquiry has substantiated that these events did occur on the date stated. This action is considered to be physical abuse of the client as defined in RSMO. Section 630.155[.1] which states:

"A persons [sic] commits the crime of patient, resident or client abuse or neglect if he does any of the following:

(1) Purposely beats, strikes, wounds or injuries [sic] any patient, resident or client of any residential facility or day program operated, funded or licensed by the department;

(2) In any other manner whatsoever mistreats or maltreats, handles or treats any such patient, resident or client in a brutal or inhuman manner;

(3) In handling such patient, resident or client uses any more force than is reasonable or apparently necessary for the proper control, treatment or management of such patient, resident or client;

(4) Fails to provide services which are reasonable and necessary to maintain the physical and mental health of any patient, resident or client of any residential facility or day program operated, funded or licensed by the department which such failure presents either an imminent danger to the health, safety or welfare of the patient, resident or client, or a substantial probability that death or serious physical harm would result."

.    .    .    .    .    .

Respondent's brief concedes that the only provision of § 630.155.1, the statute relied upon by the Appointing Authority in equating appellant's conduct with "physical abuse," is subparagraph (2), i.e., that appellant committed acts of physical abuse of Kalinda by mistreating or maltreating, handling or treating her "in a brutal or inhuman manner."

In considering appellant's conduct, this court is not to substitute its judgment of the evidence for that of the board. *Kunz v. Personnel Advisory Bd.*, 740 S.W.2d 395, 397 (Mo.App.1987). The fact-finding function is that of the board. *Id.* "The

Board weighed the credibility of the testimony received and was free to accept or reject all or part of any witness' testimony." *Id.*

The board's findings included that appellant did "take moisturizer on her hands and smear it onto the client's face." Although those facts were disputed, they are supported by substantial and competent evidence. For purposes of appellate review, those facts are accepted as if undisputed.

> Where an administrative decision resolves an issue of fact, a reviewing court may not substitute its own judgment for that of the agency, if its findings of fact are supported by competent and substantial evidence. "On the other hand, where an administrative decision is clearly based upon the agency's interpretation or application of the law, the administrative conclusions of law and decision based thereon are matters for the independent judgment of the reviewing court, and correction where erroneous."

*St. Louis County v. State Tax Comm'n,* 562 S.W.2d 334, 337–38 (Mo. banc 1978), *quoting State Board of Registration for Healing Arts v. Masters,* 512 S.W.2d 150, 158 (Mo.App.1974). Paragraphs 5 and 6 of the board's Findings of Fact set out the acts that the board found appellant committed that constituted physical abuse. Those Findings of Fact are quoted, *supra;* however, they are also marginally noted for reference.[3] The issue to be determined is whether the facts found by the board constitute "physical abuse."

The board found that physical abuse occurred by applying § 630.155.1(2) ("the law") to the facts. As such, the finding of physical abuse constitutes a matter about which this court may exercise its independent judgment in determining whether the board is correct in its decision upholding the discharge of appellant. *Kunz v. Personnel Advisory Bd., supra;* § 536.140.3.

Section 630.155.1(2) provides that client abuse occurs if a person "mistreats or maltreats, handles or treats [a] patient, resident or client in a brutal or inhuman manner." In construing the meaning of a statute, its words and phrases are taken in their plain or ordinary and usual sense. § 1.090. The words of § 630.155.1(2) that are critical to its interpretation or application include "mistreats," "maltreats," "handles," "treats," "brutal," and "inhuman."

The words "mistreat" and "maltreat" have been construed by an Oregon court to be synonymous. *State v. Samter,* 4 Or. App. 349, 479 P.2d 237, 239 (1971). That court defined the words as meaning "to treat badly or to abuse another." Webster's New Collegiate Dictionary (1974) defines mistreat and maltreat: mistreat—to treat badly; maltreat—to treat cruelly or roughly. "Cruelly," according to *State v. Samter, supra,* "means to cause pain or hurt."

Applicable definitions, according to Webster's New Collegiate Dictionary (1974), of the other words that are critical to the interpretation of § 630.155.1(2) include:

> handle—to manage with the hands; to deal with, act on, or dispose of;
>
> treat—to deal with; synonyms are treat, deal, handle;
>
> brutal—grossly ruthless or unfeeling;
>
> cruel—disposed to inflict pain or suffering; causing or conducive to injury, grief or pain;
>
> inhuman—lacking pity, kindness or mercy; savage.

There was no showing that appellant inflicted pain upon Kalinda by rubbing hair moisturizer on her face. There was no showing that the hair moisturizer was a substance that was harmful or injurious to Kalinda's person when placed upon her face. There was no showing that the rubbing of the hair moisturizer on Kalinda's face was done roughly. Even if it were

---

3. Paragraphs 5 and 6 of the board's Findings of Fact are as follows:

    5. Appellant was observed to take moisturizer on her hands and smear it onto the client's face.

6. The Board finds that the Appellant did perform these actions alleged and that they constitute physical abuse of a client.

conceded that appellant's actions constituted mistreatment or maltreatment of Kalinda, no brutality or savagery was shown. The facts as found by the board, and which this court must accept under the circumstances of this case, did not constitute mistreatment or maltreatment of Kalinda in a brutal or inhuman manner.

The judgment of the Circuit Court of Butler County is reversed and the case remanded. The Circuit Court of Butler County is directed to enter judgment reversing the decision and order of the Personnel Advisory Board. The circuit court is further directed to order the Personnel Advisory Board to reinstate appellant retroactive to December 24, 1987, and to order that she be paid all salary to which she would have been entitled but for her dismissal. § 36.390.5(1).

FLANIGAN, C.J., and SHRUM, J., concur.