**George and Shirley ROY, Appellants,**

v.

**MISSOURI PACIFIC RAILROAD COMPANY, Union Pacific Railroad Company, and Stephen Wheeler, Respondents.**

No. WD 57597.

Missouri Court of Appeals,
Western District.

Jan. 30, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 27, 2001.

Application to Transfer Denied
May 29, 2001.

Andrew J. Gelbach, Warrensburg, for appellant.

Michael B. Buser, Kansas City, for respondent.

Before HOLLIGER, P.J., LOWENSTEIN, and NEWTON, JJ.

### Factual and Procedural Background

NEWTON, Judge.

On June 26, 1993, George Roy was driving his 1986 Ford pickup truck through a railroad grade crossing when a Union Pacific Railroad train struck his truck. Stephen Wheeler, the train engineer, was operating the train at the time of the accident. The train consisted of three locomotives and 113 empty coal cars. Matt Carson, the train conductor, was also on the train. Union Pacific owned the railroad tracks, Missouri Pacific Railroad, and a fifty-foot right of way on both sides of the track.

At this particular crossing, the railroad tracks run east and west, while the gravel road runs north and south. As a motorist approaches the crossing, a yellow advanced warning sign is located 300 feet before the crossing. A stop sign and cross bucks are located approximately eighteen feet in front of the tracks. The speed limit on this county road was fifty-five miles per hour. The maximum allowable train speed, according to Union Pacific's rules, was fifty miles per hour, and as per the Federal Railroad Administration, the maximum was sixty miles per hour.

Mr. Roy testified that he stopped at the stop sign, looked both ways and proceeded

to the crossing. Just then, he saw the train and applied his brakes, while allegedly traveling approximately four miles per hour. Consequently, he testified that he slid ten to fourteen feet. His truck stopped on the first rail and the train collided with his truck, knocking it sideways and off of the gravel roadway.

A whistle post placed approximately 1,844 feet from the subject grade crossing tells the engineer when to start sounding the horn. The horn notifies pedestrians and drivers that the train is approaching the crossing. Mr. Roy claims he did not hear the train's whistle blowing when he stopped at the stop sign. Mr. Wheeler testified that he did not begin to blow the horn at the whistle post, but began sounding the horn approximately two to four seconds before the collision when he noticed Mr. Roy's truck near the tracks.

Trooper Dale Stewart responded to the accident approximately twenty minutes after the collision, but Mr. Roy was taken by ambulance from the scene prior to Trooper Stewart's arrival. Trooper Stewart filed a report and testified at trial. In his report, he recorded twenty-eight feet of slide marks at the scene, which started about ten feet before the stop sign and continued past the stop sign up to the first rail of the railroad track. He testified to this at trial. He admitted that he could only speculate that the slide marks came from Mr. Roy's truck because he did not measure the skid marks against Mr. Roy's tires, and he saw no slide deviation marks when the train struck Mr. Roy's truck knocking it from the road. On a diagram admitted into evidence, it showed the twenty-eight feet of slide marks with a "# 1" on top of them. In the report, the trooper designated vehicle # 1 as Mr. Roy's truck. Mr. Roy objected to this diagram and to Trooper Stewart's testimony regarding the connec-

tion between the slide marks and Mr. Roy' truck.

The respondents also called expert witness Mr. Jay Pfeifer, an accident reconstructionist, to testify regarding several measurement and technical engineering analyses conducted with regard to the accident. Mr. Roy objected to several points of his testimony.

Mr. Roy suffered injuries to his right and left forearm, multiple left rib fractures, left pulmonary contusion, collapsed lungs, nasal fracture, chest injuries, multiple contusions and abrasions. He incurred medical expenses exceeding $51,000 and lost income of approximately $20,000. After a five-day trial, a jury returned a verdict in favor of the respondents finding Mr. Roy 100 percent at fault. He timely filed his motion for judgment notwithstanding the verdict or in the Alternative for a New Trial. The trial court denied the motion. This appeal followed.

Mr. Roy raises seven points on appeal. First, he alleges that the trial court erred by allowing Trooper Stewart to testify that Mr. Roy's truck left twenty-eight feet of slide marks because he failed to lay the proper foundation or offer competent evidence to show that Mr. Roy's truck left that specific twenty-eight feet of slide marks for the reason that the trooper admitted his conclusion was based on speculation and conjecture. Then upon sustaining Mr. Roy's objection to this testimony, the court erred by denying his motion for new trial. Furthermore, the evidence showed that there were no side deviation marks from the straight slide marks at the point where the train struck the truck and knocked it off the roadway, and therefore, the twenty-eight feet of slide marks could not have come from Mr. Roy's truck. Moreover, Mr. Roy claims that Trooper Stewart was not a qualified expert to testi-

fy to such a matter, prejudicing Mr. Roy as indicated by the jury's verdict.

Second, Mr. Roy claims that it was in error for the trial court to allow a not-to-scale diagram of the twenty-eight feet of slide marks with the reference to vehicle "# 1" contained in Trooper Stewart's report into evidence and allowing the jury to have the exhibit during deliberation because it was highly prejudicial and misled the jury. His third point addresses an alleged error in the submission of a jury instruction. He contends that there was not competent or substantial evidence to submit Instruction No. 9, it misstated the law, and constituted a roving commission. Instruction No. 9 requested the jury to assess fault to Mr. Roy if it found that he failed to stop at the stop sign, failed to keep a careful lookout, should have known that there was a reasonable likelihood of a collision in time to have avoided it but that he failed to do so, or that the Mr. Wheeler sounded the horn sufficiently in advance and Mr. Roy failed to heed the warning.

Points four, five, and six all allege error in allowing the railroad's expert witness, Mr. Jay Pfeifer, to testify to certain subjects Mr. Roy claims were based on speculation, conjecture, and without proper foundation. Mr. Roy's claims of error address the following subjects of testimony from Mr. Pfeifer: (1) testimony regarding Mr. Roy's "emergency perception reaction;" (2) testimony that a vehicle traveling four miles per hour on this gravel road and applying his brakes would slide less than one foot; and (3) testimony that a motorist could get across this particular crossing in 4.15 seconds.

Mr. Roy's final point on appeal involves Exhibit 215, which was the Manual on Uniform Traffic Control Devices (MUTCD) concerning the use of stop signs at railroad grade crossings and under what circumstances the placement of stop signs at grade crossings are appropriate. Mr. Roy contends that the trial court erred by refusing to admit exhibit 215 into evidence because it was relevant to test Mr. Pfeifer's qualifications, particularly when the railroad was allowed to use the information when cross examining Mr. Roy's expert witness, Mr. John Glennon.

## Legal Analysis

### I. Testimony of Lay Witness

■ We will address points one and two together since the testimony complained of is derived from Trooper Stewart's police report, which contained the diagram about which the trooper testified. Mr. Roy argues that the trial court erred in allowing Trooper Stewart to testify, over his objections, that Mr. Roy's truck skid twenty-eight feet beginning ten feet behind the stop sign and continuing up to the railroad tracks. The trooper's testimony was based on a diagram he constructed upon arriving at the scene of the accident. Furthermore, Mr. Roy contends that the trooper's testimony was based on speculation without competent evidence or any foundation. The scope and extent of cross-examination are within the discretion of the trial court.[1] We will not disturb the trial court's decision unless abuse of that discretion can be clearly demonstrated.[2]

■ During direct examination Trooper Stewart testified that there was a set of skid marks that measured twenty-eight feet in length that began approximately ten feet before the stop sign and ended at the first railroad track. He also testified that it would be speculation on his part to

---

1. *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 868–69 (Mo. banc 1993).

2. *Id.*

say what vehicle left the twenty-eight feet of slide marks and when the marks were made. Further, he testified that he did not measure the width of the tire slide marks against either of Mr. Roy's truck tires, nor did he measure the wheelbase of the truck tires. The slide marks were straight without any side deviations, which, the trooper testified, was exceptional in this type of collision. The side deviations would have occurred when the train struck Mr. Roy's truck pushing it sideways and down the tracks. The trooper testified that he did not see any marks indicating how Mr. Roy's truck slid upon impact.

On cross-examination, Mr. Roy complains that the railroad elicited testimony from Trooper Stewart that was based on speculation, conjecture, and lack of foundation. Mr. Roy objected to the testimony during the respondents' cross-examination as follows:

Mr. Buser: ... You see 28 feet of slide marks and you put it on your diagram on this accident investigation; is that correct?

Trooper Stewart: Yes, Sir.

Q: Can you explain to me why you did that?

Mr. Gelbach: Judge, I object to that. It calls for speculation and conjecture and he's already testified he doesn't know when or who or what left it.

The Court: Overruled.

Mr. Gelbach: This also calls for the subject of expert testimony.

The Court: Overruled.

* * *

Mr. Buser: The marks appeared to be very fresh and there were—there was no other part of the road, no other dirt, no other gravel, other marks that would have indicated they had engaged and they appeared to be from Mr. Roy's truck.

Mr. Gelbach: Move the answer be stricken, not responsive, Judge.

The Court: That will be stricken.

Mr. Gelbach: Ask the Jury to be instructed to disregard.

The Court: The jury will disregard the last remark.

Mr. Gelbach: Move for a mistrial.

The Court: Overruled.

Mr. Buser: What—Just so we're correct, the references to the freshness of the tire marks is not being struck, is that right, your Honor?

The Court: Correct.

* * *

Mr. Buser: Now, with regard to your report, is it—and I'm just asking about your report now, is it correct, that you have, contained a box called, box number 13, vehicle action.

A: Yes, Sir.

Q: And Mr. Gelbach asked you about speculation as to the—who put those 28 feet of slide marks on the roadway. My question to you with regard to your report, is it true or not true, that you attributed the skidding to vehicle number one to the slide marks?

Mr. Gelbach: Judge, same objection. Calls for speculation and conjecture. He's already testified he didn't know when, what, who, when, or how and he's also not an expert. He's already testified he couldn't say that. This section of the report is inappropriate and it calls for expert testimony, which he says he's not.

The Court: Overruled.

* * *

Q: All right, with regard to box number 13 which action, can you indicate to me if you marked that vehicle one at a particular skidding motion which you related to the 28 feet of slide marks?

Mr. Gelbach: Judge, I object to that. It's absolute speculation and conjecture, calls for expert testimony, invades the province of the Court and the Jury, he's not an expert and says he's not, he has no factual basis to give that opinion.

The Court: Overruled.

A: That's correct.

Q: OK and why is it that you did that?

Mr. Gelbach: Same objection.

The Court: Sustained.

The trial court limited Trooper Stewart's testimony to the contents of his police report and the diagram contained within that report. In the report, the trooper designates Mr. Roy as driver number one and his truck as vehicle number one (V1), whereas Mr. Wheeler was denoted driver number two and the train vehicle number two (V2).

In the diagram, question number 13 is labeled "Vehicle Action" and contains eighteen questions describing "V1" and "V2" actions. Under the V1 column, the trooper marked the "skidding," "stopped," and "avoiding" boxes. Under the V2 column, he marked "going straight." On the diagram Trooper Stewart drew two parallel lines indicating 28 feet of skid marks beginning behind the stop sign and ending at the track. On top of the lines, he drew a rectangle and designated it "# 1." This indicated that vehicle number one, Mr. Roy's truck, caused the sliding marks. The court instructed Mr. Roy to redact the diagram removing points of impact and the reference made to Mr. Roy's vehicle.

Upon redacting the diagram, Mr. Roy deleted the rectangular box depicting Mr. Roy's vehicle but left the "# 1" on the skid marks. Then when the trooper testified at trial, he was asked about the "# 1," and the railroad asked him to identify which vehicle was vehicle # 1. He replied that it was Mr. Roy's truck.

■ Trooper Stewart was not qualified to testify as an expert witness as an accident reconstructionist, and neither party contests this issue. He testified as a lay witness. "[A] lay witness may testify about perceptible facts which tend to show where an accident occurred."[3] Generally, courts allow testimony of what an officer observes at the scene of an accident, including skid marks.[4] Furthermore, a lay witness can testify as "to what he hears, feels, tastes, and smells, as well as [to] what he sees."[5] Trooper Stewart was qualified to testify regarding the location of the skid marks and the appearance of the skid marks.[6]

■ Generally, a diagram is admissible under the business records exception to the hearsay rule because it was part of the trooper's official report of the accident.[7] But the business records exception does not allow the maker of the report to testify to anything in the report that would otherwise be inadmissible.[8] Any statements made by the officer which were not part of his observations cannot be admitted into evidence under the business records exception to the hearsay rule unless

3. *Fieser v. Snyder*, 797 S.W.2d 752, 754 (Mo. App. E.D.1990).

4. *Elmahdi v. Ethridge*, 987 S.W.2d 366, 372 (Mo.App. W.D.1999).

5. *See id.* (quoting *Peterson v. National Carriers, Inc.*, 972 S.W.2d 349, 356 (Mo.App. W.D. 1998)).

6. *See id.; State v. Ryan*, 275 S.W.2d 350, 352 (Mo.1955).

7. § 490.680 RSMo (1994); *Nelson v. Holley*, 623 S.W.2d 604, 606–07 (Mo.App. W.D.1981).

8. *Edgell v. Leighty*, 825 S.W.2d 325, 329 (Mo. App. S.D.1992); *Hamilton v. Missouri Petroleum Prod. Co.*, 438 S.W.2d 197, 201 (Mo.1969).

he was qualified to do so. We must determine whether Trooper Stewart was qualified to offer an opinion as to what caused the slide marks on the gravel road. He admitted that he could only speculate as to what caused the marks or when the marks occurred. Therefore, Mr. Roy's objections that this witness' conclusions called for speculation and conjecture were well founded.

In *State v. Ryan*,[9] the court held that although the officer, who was called to testify about skid marks at the scene of an accident, was merely a lay witness and not qualified to testify as an expert, he could testify to mere conclusions because it was relevant to the issue of carelessness. The officer testified that the defendant's vehicle swerved and skidded around before it overturned. The defendant objected on the grounds that the testimony was prejudicial because it established that the defendant was operating the truck in a reckless manner prior to overturning it. The court recognized that the officer's testimony was a conclusion but held that it was relevant to whether the defendant was reckless and intoxicated at the time of the accident. The court distinguished between a lay witness' conclusions on a material fact not the subject of proof by opinion evidence and a witness' description of his matter of fact cause and effect comprehension of things by which he has seen before personally through his ordinary experience in everyday life. The court continued that if the issue in the case dealt with "the precise manner in which or place where the truck skidded and overturned, then a question of the prejudicial effect of those parts of the witness' testimony conveying his conclusions of the precise way the truck moved

and how and where the upset occurred might be a more serious one." [10]

■ Here, the skid marks were relevant to show that Mr. Roy failed to stop at the stop sign prior to approaching the train crossing. Trooper Stewart, although not an expert, is qualified to give his opinion as to the existence and description of the skid marks because he witnessed them upon arriving at the scene of the accident. But because the issue in this case specifically involves the precise place of the marks and whether they in fact came from Mr. Roy's truck, the testimony of Trooper Stewart concluding that vehicle "# 1," Mr. Roy's truck, caused the skid marks was inadmissible. Trooper Stewart was allowed to state a conclusion and infer that the skid marks came from Mr. Roy's truck, which is improper testimony for a lay witness since he did not witness the accident and did not see Mr. Roy's truck slide through the stop sign to the tracks. But we will not reverse the trial court under an abuse of discretion standard unless we find that the erroneous ruling was so unreasonable and prejudicial that reversal is warranted.[11]

■ Such an inference could be highly prejudicial to the plaintiff, but the testimony was not prejudicial to Mr. Roy's case. Mr. Roy testified that he in fact skidded ten to fourteen feet. He claims he stopped at the stop sign and proceeded to the tracks traveling at approximately four miles per hour, applying his brakes immediately thereafter, causing him to slide. Further, upon entering the hospital, Mr. Roy admitted to the treating neurologist, Dr. Waxman, that he remembered seeing the train, but was trying to drive ahead of it by crossing the tracks. Moreover, Mr.

9.   275 S.W.2d 350 (Mo.1955).

10.   *Id.* at 352.

11.   *Still v. Ahnemann,* 984 S.W.2d 568, 575 (Mo.App. W.D.1999).

Roy was given an opportunity to redact the diagram contained in the trooper's report and failed to delete the "# 1" which appeared on the skid marks and admitted it into evidence during his case in chief. In addition, the trooper testified several times that he was not certain what caused the marks or where they came from, but they appeared to be very fresh. Based on other substantial evidence, such as the diagram showing the slide marks, a jury could have inferred that the marks came from Mr. Roy's truck even without the trooper's explicit conclusion. Therefore, points one and two are denied.

## II. Jury Instruction

In point three, Mr. Roy claims that the trial court erred in giving jury Instruction No. 9 because there was not competent or substantial evidence to support a submission that (1) Mr. Roy failed to keep a careful lookout; (2) Mr. Roy failed to stop at the stop sign; (3) that Mr. Wheeler failed to sound the train's horn sufficiently in advance and that Mr. Roy failed to heed the train's horn; or (4) that Mr. Roy should have known that there was a reasonable likelihood of collision in time to have avoided the collision but failed to do so. Moreover, Mr. Roy claims that since each and every one of the foregoing acts caused the collision, the instruction should not have been submitted because it misstated the law and constituted a roving commission.

The instruction read as follows:

In your verdict you must assess a percentage of fault to plaintiff George Roy, whether or not defendants were partly at fault, if you believe:

First, either:

plaintiff George Roy failed to keep a careful lookout, or

plaintiff George Roy failed to stop at the stop sign, or

defendant Wheeler sounded the train's horn sufficiently in advance and plaintiff George Roy failed to heed defendants' train's horn, or

plaintiff George Roy should have known that there was a reasonable likelihood of collision in time thereafter to have avoided the collision but failed to do so, and

Second, plaintiff George Roy, in any one or more of the respects submitted in Paragraph First, was thereby negligent, and

Third, such negligence of plaintiff George Roy directly caused or directly contributed to cause any damage plaintiffs may have sustained.

■■■■ Any instruction submitted to a jury must be supported by substantial evidence.[12] "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of facts can reasonably decide a case."[13] "Whether sufficient evidence was presented to submit an issue to the jury is a legal question and not an exercise of judicial discretion."[14] In reviewing the submissibility of an instruction, we view the evidence and reasonable inferences in the light most favorable to the instruction and disregards all contrary evidence and inferences.[15]

---

12. *Griffin v. Kansas City Southern R.R. Co.,* 965 S.W.2d 458, 462 (Mo.App. W.D.1998).

13. *Hurlock v. Park Lane Med. Ctr., Inc.,* 709 S.W.2d 872, 880 (Mo.App. W.D.1985).

14. *Deckard v. O'Reilly Automotive, Inc.,* 31 S.W.3d 6, 18 (Mo.App. W.D.2000) (citing *King v. Unidynamics Corp.,* 943 S.W.2d 262, 267 (Mo.App. E.D.1997)).

15. *Id.*

The respondents' comparative fault instruction submitted four disjunctive theories of liability: (1) George Roy failed to keep a careful lookout; (2) failed to stop at the stop sign; (3) Mr. Wheeler sounded the train's horn sufficiently in advance and Mr. Roy failed to heed defendants' train's horn; or (4) Mr. Roy should have known that there was a reasonable likelihood of collision in time thereafter to have avoided the collision but failed to do so. Each one must be supported by substantial evidence, or we must find that the instruction was submitted in error.[16]

## A. Failure to keep a careful lookout

■ Mr. Roy claims that the evidence did not support a submission that Mr. Roy failed to keep a careful lookout because the vegetation growing near the track blocked his view and the train did not sound its horn to warn Mr. Roy that it was approaching. The respondents allege that there was indeed substantial evidence to support a submission on failure to keep a careful lookout. We agree.

Mr. Roy testified that the windows of his truck were up, his air conditioner was on, and he was listening to the radio at a medium volume prior to impact. Trooper Stewart testified that, on the day of the accident, Mr. Roy had an unobstructed view of approximately 660 feet eastward from the stop sign, the direction in which the train was approaching. Further, Mr. Pfeifer testified that, based upon his survey and photos, the unobstructed easterly view down the tracks from the stop sign was 750 feet. In addition, both Respondent Wheeler and Conductor Carson testified that they could see the crossing from 500 feet away as they approached from the east.

Mr. Roy also testified that from the time he stopped until the train struck him, two seconds elapsed. He also stated that he had a view of 150 feet eastward. The train was traveling at a rate of sixty-nine feet per second; so, two seconds prior to impact, the train was 138 feet away and would have been visible to Roy as he sat at the stop sign. Therefore, substantial evidence was presented to support a submission that Mr. Roy failed to keep a careful lookout.

## B. Failure to stop at the stop sign

■ Next, Mr. Roy claims that there was not sufficient evidence to submit an instruction based on Mr. Roy failing to stop at the stop sign. He argues that the erroneous admission of the twenty-eight feet of slide marks alleged negligence on Mr. Roy's part and was the only evidence submitted to support this claim. We disagree.

Mr. Roy testified that he came to a complete stop at the sign two seconds before impact. He began traveling at a rate of four miles per hour and slid ten to fourteen feet onto the tracks. The stop sign was situated eighteen feet from the track. But there was evidence offered from engineer and accident specialist, Mr. Jay Pfeifer, that if a vehicle was traveling four miles per hour on this type of road, it would slide less than one foot. Furthermore, Trooper Stewart testified that there were twenty-eight feet of slide marks at the intersection, which was admissible.[17] A jury could reasonably infer that the slide marks came from Mr. Roy's truck. Then, during a reading of Dr. Beller's deposition testimony on cross-examination, he read with no objection from Mr. Roy's medical report taken by Dr. Waxman, the first physician to treat Mr. Roy the day of the

---

16. *Id.*

17. *See supra* Part I.

accident, that Mr. Roy "apparently was ... trying to drive ahead of the train...." Therefore, substantial evidence was presented for a submission of this instruction.

## C. Failure to heed the train's horn

■ Mr. Roy next claims that there was no substantial evidence to support a submission to the jury that Wheeler sounded the train's horn sufficiently in advance to allow Mr. Roy time to heed the defendants' train horn. David Reeves, manager of train operations, testified that the train's horn sounded for 756 feet prior to impact. The train's event recorder reflects 11 seconds of horn activity prior to impact. Furthermore, the statement from Dr. Beller regarding Mr. Roy's admission that he "was trying to drive ahead of the train that was crossing the tracks" goes to the very essence of this defense. Therefore, substantial evidence was presented to allow a jury to find that Mr. Roy failed to heed the train's horn.

## D. Time to avoid the accident

■ Finally, Mr. Roy contends that there was not substantial evidence to support a submission of Instruction No. 9 because evidence was not presented to show that he should have known that there was a reasonable likelihood of collision in time thereafter to have avoided the collision. But evidence was admitted which showed that the train's horn sounded for eleven seconds prior to impact. Mr. Roy testified that approximately two seconds elapsed between the time he was at the stop sign until the time of the accident. The jury could reasonably infer that if the train sounded for eleven seconds and Mr. Roy was at the stop sign just two seconds prior to impact, the horn was blowing as

Mr. Roy approached the stop sign, while he was stopped at the stop sign, and as he proceeded to the tracks.

There is also evidence that Mr. Roy should have been able to see the train coming prior to impact. Trooper Stewart testified that he could see approximately 660 feet down the tracks from the stop sign. Mr. Pfeifer testified that there was approximately 750 feet of visibility from the stop sign. Finally, Mr. Wheeler and Mr. Carson testified that they could see the crossing from approximately 500 feet. Thus, a jury could reasonably conclude that Mr. Roy should have been able to see the train from the stop sign before approaching the tracks avoiding the collision.

In addition, Mr. Roy raises an issue in the argument portion of his brief that is not set forth in the points relied on. He argues that the fourth section of paragraph first of the instruction was improperly submitted because it failed to comply with MAI 17.04 by not including the specific acts or combination of acts as required in MAI. The MAI instruction says "defendant knew or by the use of the highest degree of care could have known that there was a reasonable likelihood of collision in time thereafter to have *stopped, or swerved or, slackened speed, or sounded a warning, or slackened speed and swerved, or slackened speed and sounded a warning, or swerved and sounded a warning* but defendant failed to do so." [18]

■ Mr. Roy failed to object on this specific ground at trial. Instead, he objected only to the lack of evidence to support the submission, thereby failing to preserve his right to object now on appeal.[19] However, these unpreserved claims of error may still be reviewed, in the appellate court's discretion, for plain error. "Plain

---

**18.** The italicized language was not included in defendants' comparative fault instruction.

**19.** Missouri Court Rules 70.03

error review is rarely applied in civil cases, and may not be invoked to cure the mere failure to make proper and timely objections." [20]  Mr. Roy's theory advanced in Point 3 also differs from that advanced in the corresponding argument in violation of Rule 84.04(e), which requires the argument to substantially follow the point.[21]  Therefore, since the theory was not properly preserved for appeal by a proper objection or compliance with the rules of civil procedure, we will review it for plain error only under Rule 84.13(c).

As Mr. Roy points out, MAI 17.04 is an instruction submitted when one party claims that the other failed to act after danger of a collision became apparent, and it requires the insertion of one or more acts the proposing party submits the alleged negligent party should or could have done in order to prevent the accident. Here, the railroad submitted this instruction as part of their comparative fault defense alleging that Mr. Roy failed to take appropriate steps to prevent the accident. The error involves failing to describe the act or acts that Mr. Roy allegedly should have or could have done to prevent the accident.

■■■ Further, he contends that the instruction constituted a roving commission. "A jury instruction amounts to a 'roving commission' when it fails to advise the jury, or point out in any way, what acts or omissions on the part of the [plaintiff], if any, found by them from the evidence, would constitute liability." [22]  "A jury instruction may also be considered a roving commission when it is too general or where an instruction is submitted in a broad, abstract way without any limitation to the facts and law developed in the case." [23]

The instructional error may have prejudiced Mr. Roy, but under a plain error review he is required to show more than prejudice.  He must "prove that the error resulted in a manifest injustice or miscarriage of justice." [24]  This instructional error did not rise to the level of plain error. Therefore, we affirm the trial court's submission of the Instruction No. 9, and find that there was substantial evidence to support each of the disjunctive portions of the respondents' comparative fault instruction. Point three is denied.

## III.  Expert testimony

Next, Mr. Roy argues in points four, five and six that testimony from the respondents' expert witness, Jay Pfeifer, lacked the requisite foundation for his opinion on the following subjects: (1) his testimony regarding Mr. Roy's "emergency perception reaction;" (2) his testimony that a motorist traveling four miles per hour on this particular gravel road and applying his breaks would slide less than a foot; and (3) his testimony that a motorist could get across this railroad crossing in 4.15 seconds.  He claims that all of the above testimony was based on speculation and conjecture and was not the proper subject of expert testimony.

**20.**  *Guess v. Escobar,* 26 S.W.3d 235, 241 (Mo. App. W.D.2000) (citations omitted).

**21.**  *Missouri Highway & Transp. Comm'n v. Taylor,* 839 S.W.2d 676, 679 (Mo.App. S.D. 1992).

**22.**  *Centerre Bank of Kansas City, Nat'l Ass'n v. Angle,* 976 S.W.2d 608, 617 (Mo.App. W.D.

1998) (quoting *Lashmet v. McQueary,* 954 S.W.2d 546, 550 (Mo.App. S.D.1997)).

**23.**  *Id.*

**24.**  *State v. Roe,* 6 S.W.3d 411, 415 (Mo.App. E.D.1999).

Generally, expert testimony is acceptable when the matter at issue is one with which lay jurors are not likely to be conversant, and when the opinion will be valuable to the jury, provided it does not invade the province of the jury.[25] However, if the topic is one of everyday experience, the testimony of an expert witness is properly rejected.[26] "An expert's testimony is admissible on those subjects about which the jury lacks experience or knowledge and which will assist the jury, unless it unnecessarily diverts the jury's attention from the relevant issues."[27] Consequently, the trial court enjoys a great deal of discretion in determining what is common knowledge and what testimony is admissible.[28] Hence, the standard of review for the admission of Mr. Pfeifer's testimony is abuse of discretion, and reversal is warranted when the court's ruling is clearly against the logic of the circumstances or when it is arbitrary and unreasonable.[29]

Admissibility of expert testimony is governed by § 490.065,[30] which states:

1. In any civil action, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

2. Testimony by such an expert witness in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

3. The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.

4. If a reasonable foundation is laid, an expert may testify in terms of opinion or inference and give the reasons therefor without the use of hypothetical questions, unless the court believes the use of a hypothetical question will make the expert's opinion more understandable or of greater assistance to the jury due to the particular facts of the case.

The railroad called Mr. Pfeifer, a mechanical engineer, who has practiced accident reconstruction for approximately nineteen years. Mr. Pfeifer outlined for the court his extensive qualifications including a Bachelor of Science in Mechanical Engineering, board certified in accident reconstruction by the National Academy of Forensic Engineers, conducted over one thousand investigations and testified as an expert in this area eighty to one hundred times. Further, he has instrumented over fifty emergency brake applications on locomotive engines. He also wrote a symposium on railroad and highway grade crossing safety and co-authored a chapter in a book focusing on engineer and accident reconstruction. He attended workshops where automobiles had been crashed to evaluate and develop techniques for analy-

25. *Wessar v. John Chezik Motors, Inc.*, 623 S.W.2d, 599, 602 (Mo.App. W.D.1981).

26. *Id.*

27. *Peterson v. Nat'l Carriers, Inc.*, 972 S.W.2d 349, 354 (Mo.App. W.D.1998) (citing *State v. Lawhorn*, 762 S.W.2d 820, 822–23 (Mo. banc 1988)).

28. *Hacker v. Quinn Concrete Co., Inc.*, 857 S.W.2d 402, 407 (Mo.App. W.D.1993).

29. *Peterson*, 972 S.W.2d at 354.

30. RSMo (1994).

sis of crush characteristics. He has been qualified as an accident reconstructionist in both federal and state courts, including Missouri. Currently, his firm primarily investigates and analyzes transportation-related accidents, particularly automobile and railroad collisions. The trial court properly found that the witness was qualified to testify in this case.

Before Mr. Pfeifer took the stand, Mr. Roy had already testified to the following facts (1) that as he approached the stop sign, he was traveling at a rate of thirty-five miles per hour, but was decelerating steadily; (2) he then came to a complete stop four feet in front of the stop sign, which is located eighteen feet from the tracks, according to testimony and the redacted diagram; (3) prior to sliding ten to fourteen feet, he was traveling at a rate of approximately four miles per hour; and (4) when he realized the train was coming, he applied his brakes and slid a total of ten to fourteen feet on to the tracks, at which point the train struck him.

■ Mr. Pfeifer was asked to use his knowledge of accidents and this information to determine where the vehicle would have been located in order to slide ten to fourteen feet onto the railroad track and the approximate speed of the vehicle when the sliding began. The witness testified that, given the distance a vehicle slid (i.e., length of slide marks), the speed of the vehicle could be ascertained by applying a basic formula. He explained that in any accident a driver must perceive something that causes him or her to apply the brakes. This element, known as "emergency perception reaction" time, is generally three-quarters of a second, or it takes three-

quarters of a second for an individual to react to an emergency from the time he or she observes it.[31] Given the general emergency perception reaction time, Mr. Pfeifer ascertained that a driver's reaction, in order to cause the ten to fourteen feet of marks according to Mr. Roy's testimony, would have occurred 25.3 to 32.0 feet from the final stopping point of the vehicle.

■ Testimony regarding vehicle stopping distances is a proper subject for expert testimony.[32] Mr. Pfeifer's testimony is consistent with statutory guidelines of admissible testimony in that it utilizes a method of determining speed that is reasonably relied upon within that professional community.[33] The record indicates:

Mr. Buser: Now, are there within the engineering community, recognized formulas for perception reaction time?

Mr. Pfeifer: Yes.

Mr. Buser: And did you employ these formulas at my request?

Mr. Pfeifer: Yes.

This testimony was admitted with no objection.

■ Furthermore, testimony by an expert about the distance in which a vehicle can stop when going a certain speed, as well as expert testimony that determines minimum speed based upon the length of slide marks, is admissible by expert or opinion testimony.[34] The witness applied formulas and coefficients that are generally used within his profession, coupled with facts gleaned from Mr. Roy's testimony, to draw his conclusions. The data on stop times is highly scientific and beyond the scope of ordinary experience. Therefore,

**31.** *Kilgore v. Linville*, 733 S.W.2d 62, 64 (Mo. App. E.D.1987).

**32.** *Cheek v. Weiss*, 615 S.W.2d 453, 456–57 (Mo.App. E.D.1981).

**33.** § 490.065(3).

**34.** *Dillenschneider v. Campbell*, 350 S.W.2d 260, 266–67 (Mo.App.1961).

expert testimony aided the trier of fact in this case and was properly admitted in accordance with § 490.065.

■ Finally, Mr. Roy's assertion that "emergency perception reaction" testimony lacked evidentiary foundation is without grounds. The facts that Mr. Pfeifer used to formulate his expert opinion had already been admitted into evidence as governed by § 490.065.4. Admission of this evidence was consistent with what is within the discretion of the court. The trial court properly allowed Mr. Pfeifer's testimony regarding Mr. Roy's "emergency perception reaction."

■ Mr. Pfeifer made his calculations based upon a mathematical equation, which required knowledge of the coefficient of friction of the roadway and one of the two variables, length of slide or speed at the time of initial braking. The formula used to determine Mr. Roy's slide marks, if he was traveling at four miles per hour, was the same one used to determine Mr. Roy's speed based on his testimony that he slid ten to fourteen feet. Mr. Pfeifer's knowledge of the crossing was based upon his personal inspection, survey, review of photographs, and Mr. Roy's testimony. Therefore, the testimony that a vehicle traveling four miles per hour would slide less than a foot was proper. Points four and five are denied.

■ Then Mr. Roy argues that Mr. Pfeifer's testimony that a motorist could travel across the railroad crossing in 4.15 seconds was improper. We disagree. Mr. Pfeifer testified to a normal acceleration rate, which is the range of a vehicle's accelerations based on observations of mo-

torists, utilizing accelerometers and a radar gun. Further, he testified that within the engineering community a normal acceleration rate is 3.3 miles per second and every second would increase in speed 21.9 miles per hour per second. Therefore, he concluded that it would take a vehicle 4.15 seconds to accelerate from one side of the cross buck and to cross the crossing without its back bumper being struck. Mr. Pfeifer used a scale engineering survey of the crossing and surrounding area and based his opinion on personal observations of the accident location. For the foregoing reasons outlined in points four and five we find that the trial court did not abuse its discretion in allowing this testimony. Point six is also denied.

## IV. Admission of Exhibits

■ Finally, Mr. Roy contends that the trial court abused its discretion in not admitting into evidence an exhibit concerning the MUTCD, which sets out the requirements for placing stop signs at railroad grade crossings, because it was relevant to test the qualifications, knowledge, credibility, skill and accuracy of Mr. Pfeifer. The admission or exclusion of relevant evidence rests in the sound discretion of the trial court; only when the trial court abuses that discretion does the exclusion of evidence constitute reversible error.[35] "Failure to admit evidence does not mandate a reversal of a judgment unless the error materially affected the merits of the action." [36] We will reverse only where the error is so prejudicial as to deny Mr. Roy a fair trial.[37]

The sequence of events that led to the rejection of Mr. Roy's exhibit is lengthy and confusing. First, the respondents

35. *Brown v. Hamid,* 856 S.W.2d 51, 56 (Mo. banc 1993).

36. *Aliff v. Cody,* 26 S.W.3d 309, 315 (Mo.App. W.D.2000) (quoting *Envtl. Waste Mgmt., Inc.*

v. *Indus. Excavating & Equip., Inc.,* 981 S.W.2d 607, 613 (Mo.App. W.D.1998)).

37. *See State v. Morrow,* 968 S.W.2d 100, 106 (Mo. banc 1998).

cross-examined Mr. Roy's expert witness, Mr. John Glennon, regarding his knowledge of the MUTCD without objection. He admitted that the requirements of the MUTCD were met with regard to the devices at the crossing where this accident occurred. The respondents did not attempt to admit the MUTCD during cross-examination.

Then on direct examination of Mr. Pfeifer, the respondents attempted to question him regarding the MUTCD. Mr. Roy objected on the grounds that the exhibit had not been admitted, and the court sustained the objection. When the respondents offered only one page of a voluminous MUTCD manual, Mr. Roy objected. The court, however, admitted the one-page photocopy over objections. Then the trial court called counsel to the bench, and, in a brief colloquy, the court reminded counsel that the subject of whether the stop sign should or should not have been in place at this particular crossing had already been decided at a pretrial hearing on counsels' motions in limine. A county clerk testified that the stop sign was not approved in this jurisdiction. Therefore, under MUTCD the stop sign should not have been there. The trial court reminded counsel that this issue was already resolved, and the respondents refrained from using the exhibit and terminated this line of questioning.

Then Mr. Roy, during cross-examination of Mr. Pfeifer, asked him about the MUTCD, but his exhibit was a three-page excerpt instead of the one page photocopy the railroad used. The railroad objected on the grounds that the matter was not submitted as evidence. When Mr. Roy attempted to admit his three-page exhibit, the railroad objected, and the court sustained the objection. The court allowed Mr. Roy to make an offer of proof with the witness, but Mr. Roy only offered the exhibit and failed to ask the witness any questions in relation to the exhibit.

■ In order to preserve the issue for appeal, Mr. Roy is generally required to make an offer of proof demonstrating why the excluded evidence was relevant and material.[38] The courts have established two purposes for the offer of proof: (1) preserve the record for appeal so the appellate court understands the scope and effect of the questions and proposed answers in considering whether the trial court's ruling was proper; (2) it allows the trial court, once again, to consider the admissibility of the evidence after it is presented.[39] There is a narrow exception to the required offer of proof. If "there is a complete understanding, based on the record, of the excluded testimony; the objection is to a category of evidence, rather than to specific testimony; and the record reveals the excluded evidence would have helped the proponent", the offer of proof may not be necessary.[40] But that exception does not apply here.

Although Mr. Roy argues that the exhibit was relevant and material, he failed to make the requisite offer of proof in order to preserve this issue for appeal. This is insufficient in preserving the exclusion of evidence for appeal. Further, Mr. Roy had an opportunity to cross-examine Mr. Pfeifer regarding the one page MUTCD excerpt which the railroad admitted into evidence and used both on cross-examination of Mr. Roy's expert witness and on the respondents' own expert on

---

**38.** *Evans v. Wal–Mart Stores, Inc.,* 976 S.W.2d 582, 584 (Mo.App. E.D.1998).

**39.** *Id.* (citing *Wilkerson v. Prelutsky,* 943 S.W.2d 643, 646 (Mo. banc 1997)).

**40.** *State v. Hirt,* 16 S.W.3d 628, 633 (Mo.App. W.D.2000) (citations omitted).

direct examination. Therefore, we deny Mr. Roy's point.

## Conclusion

Based on the foregoing reasons, we affirm the trial court's judgment and the jury's verdict.

HOLLIGER and LOWENSTEIN, JJ., concur.