Jessica M. OAKES, Respondent,

v.

**MISSOURI DEPARTMENT OF MENTAL HEALTH,**
Appellant.

No. ED 89817.

Missouri Court of Appeals,
Eastern District,
Division One.

April 1, 2008.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 7, 2008.

Application for Transfer Denied June 24, 2008.

Kevin F. Hennessey, Chesterfield, MO, for respondent.

Jeremiah W. (Jay) Nixon, Atty. Gen., Ronald Q. Smith, Woodie J. Curtis, Jr., Springfield, MO, for appellant.

KENNETH M. ROMINES, Judge.

### Introduction

In this case we consider whether the Department of Mental Health ("DMH") erred in its decision that a direct care provider was guilty of brutal and inhumane treatment. The Audrain County Circuit Court, the Honorable Keith M. Sutherland presiding, reversed the decision and order.[1] By its order, the DMH placed Jessica Oakes' ("Oakes") name on the Department's Disqualification Registry for life pursuant to Section 630.170 RSMo and 9 CSR 10–5.200(11). Listing on the Disqualification Registry *forever bars* Oakes from employment in any facility which receives funds from DMH or serves DMH clients. Also because of this listing, pursuant to Section 210.900 RSMo, Oakes' name is listed on the Family Safety Care Registry, which adversely affects Oakes' ability to gain employment with nursing homes, day care facilities and other similar care facilities. We affirm the judgment of the Circuit Court reversing the DMH's decision and order.

### Facts

Oakes was a direct care provider who worked at an Independent Supported Living facility ("ISL") operated by Fink and Associates in Mexico, Missouri. Employees of Fink and Associates, under contract with the Department of Mental Health, provide services to persons with mental retardation and developmental disabilities.

C.K. is a fifteen-year-old female patient of the DMH who was a resident at the ISL in Mexico. C.K. had several failed placements at other facilities before being placed at the ISL in Mexico. C.K. is roughly the same height as Oakes, but has a stocky build and weighs 50–60 pounds more than Oakes. Prior to the incident at issue, C.K. had physically assaulted Oakes five or six times, including occasions in which C.K. hit Oakes, kicked Oakes, and dragged Oakes off a couch by her hair.

On 5 August 2005, Oakes was working her shift at the ISL in Mexico. C.K. was agitated that day. Threatening to run away, C.K. went outside the ISL building and walked into the middle of the street carrying a cordless phone. Oakes, staff member Acosta, and Resident T.W. all followed C.K. out of the home. Oakes asked C.K. to bring her the phone in hopes of coaxing C.K. out of the street, but C.K. refused. C.K. then approached the neighbor's driveway, picked up three large rocks, and began throwing them at the staff, resident T.W. and Oakes' car. Oakes approached C.K. in an attempt to calm her down and stop the rock throwing. Meanwhile, staff member Acosta took resident T.W. into the ISL.

When Oakes reached a point about two feet in front of C.K., C.K. attacked her. C.K. hit Oakes, yanked Oakes' hair and bit Oakes on the right shoulder drawing blood. Oakes held C.K.'s hand on her head to prevent C.K. from ripping out Oakes' hair or scalp. Oakes' other hand was in C.K.'s hair trying to stop C.K.'s biting attack. During her attack on Oakes, C.K. kicked, screamed and cursed at Oakes, and spit in Oakes' face. Instinctively, Oakes spit back.

---

1. We acknowledge the professional manner in which the Circuit Court assisted in the development of the record.

Staff member Acosta then came out of the ISL and grabbed one or both of C.K.'s arms. C.K. let go of Oakes' hair and fell backwards on the ground. Acosta continued to hold C.K.'s hands while C.K. kicked and screamed. Oakes held C.K.'s legs and dialed the police on her cell phone. When the police arrived, an officer attempted to restrain C.K. by placing handcuffs on her. C.K. kicked the officer and kicked the patrol car, denting it. The officer handcuffed C.K. and arrested her. C.K. suffered no injuries during her assault of Oakes or the police officer. Oakes, however, suffered a bleeding wound to her right shoulder, a softball-seized bruise on her shin and a deep scratch on her forearm. On the basis of these facts the Executive Director of the DMH region, Linda Bowers ("Bowers"), made a finding of brutal and inhumane treatment.

### Procedural History

Following the 5 August 2005 incident, Oakes wrote an initial ITS report. On 6 September 2005, Bowers sent Oakes a letter making a finding that Oakes had committed Class I neglect. Oakes requested a meeting with Bowers which took place on 19 September 2005. Following this meeting, Bowers sent a second letter to Oakes changing the final determination to physical abuse and directing that Oakes' name be placed on DMH's Disqualification Registry.

Oakes requested a hearing on the final determination, which was held on 31 January 2006, by Karl Menninger, DMH Hearing Officer. At the hearing, Bowers testified that after her meeting with Oakes, she changed her mind and rendered a finding of physical abuse instead of neglect. Bowers testified that she was not familiar with the CPI restraint training Oakes had received and that such training had no bearing on her finding of physical

abuse. Bowers only considered Oakes' action in pulling C.K.'s hair and spitting back at her in rendering her finding of physical abuse. Bowers testified that the surrounding circumstances were important, but Bowers considered Oakes' actions to be purposeful. Bowers was aware that C.K. suffered no loss of hair, no bruising, contracted no communicable disease, nor evidenced any other sign of physical injury. Bowers testified that she concluded Oakes' behavior to be "inhumane" because it involved more force than was necessary. Nevertheless, Bowers could not state what level of force was necessary. Bowers testified that Oakes' action was "inhumane" because Oakes treated C.K. "in a manner [Bowers] would not treat anyone else on the street. I [Bowers] would not walk up to anyone on the street and would spit in their face or pull their hair. To me that's inhumane."

The Hearing Officer rendered the final decision of DMH on 14 February 2006, substantiating a finding of physical abuse and affirming Bowers' decision.

### Standard of Review

Article V, Section 18, of the Missouri Constitution provides for judicial review of administrative actions to determine "whether [such agency actions] are authorized by law, and in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record." *Mo. Const. Art. V, sec. 18.*

Consistent with the constitutional standard, section 536.140.2 provides for appellate review of the administrative ruling, not that of the circuit court, to determine whether the administrative action:

(1) Is in violation of constitutional provisions;

(2) Is in excess of the statutory authority or jurisdiction of the agency;

(3) Is unsupported by competent and substantial evidence upon the whole record;

(4) Is, for any reason, unauthorized by law;

(5) Is made upon unlawful procedure or without a fair trial;

(6) Is arbitrary, capricious or unreasonable;

(7) Involves an abuse of discretion.

The decision of the agency on factual issues is presumed to be correct until the contrary is shown and the court is obliged to sustain the Commission's order if it is supported by substantial evidence on the record as a whole. *State ex rel. Atmos Energy Corp. v. Public Service Com'n of State,* 103 S.W.3d 753, 759 (Mo. 2003). We must look to the whole record in reviewing the agency's decision, not merely the evidence that supports its decision. *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 222 (Mo. banc 2003). Where the agency decision involves the interpretation of the law, as the case is here, our review is *de novo. Missouri Coalition for the Environment v. Herrmann,* 142 S.W.3d 700, 701 (Mo. banc 2004).

### Discussion

Oakes raises one issue on appeal. Oakes claims the DMH's decision abused its discretion, was contrary to law, was arbitrary, capricious and unreasonable, was not supported by competent and substantial evidence, and was against the weight of the evidence in that the DMH's decision: (1) failed to find that Oakes' behavior was "purposeful" or resulted in any injury to C.K., and (2) failed to show that Oakes' actions towards C.K. constituted mistreatment of C.K. "in a brutal and inhumane manner" and the use of more force than was necessary to gain control of C.K.

Section 630.155.1 RSMo states that a person commits the crime of "patient, resident or client abuse or neglect" if he knowingly "[m]istreats or maltreats, handles or treats any such person, patient, resident or client in a brutal or inhuman manner."

9 CSR 10–5.200(1)(E) further defines physical abuse:

(E) Physical abuse

1. An employee purposefully beating, striking, wounding or injuring any consumer; or

2. In any manner whatsoever, an employee mistreating maltreating a consumer in a brutal or inhumane manner. Physical abuse includes handling a consumer with any more force than is reasonable for a consumer's proper control, treatment or management.

### 9 CSR 10–5.200(1)(E)(1)

It is clear from the record that the DMH based its finding of physical abuse, not on the definition in subsection (1), but the definition in subsection (2). This is apparent from the DMH's findings that Oakes' actions were not purposeful but were "instinctive" or "reactive," and the undisputed fact that Oakes did not beat, strike, wound or physically injure C.K. We therefore focus our analysis on subsection (2).

### 9 CSR 10–5.200(1)(E)(2)

#### Brutal and inhumane

The DMH found that by spitting on C.K. and grabbing C.K.'s hair, Oakes treated C.K. in a brutal and inhumane manner. We disagree.

Initially, we note that the DMH's finding that Oakes' conduct was brutal is not based on any legal standard or defini-

tion. In fact it contradicts the testimony of its own Executive Director, Bowers, who testified that she did not consider Oakes' conduct brutal. Neither is the DMH's finding that Oakes' conduct was inhumane based on a legal standard or definition. The only semblance of a definition of "inhumane" upon which the DMH could have relied is Bowers' testimony that "I would not walk up to anyone on the street and would spit in their face or pull their hair. To me that's inhumane." [2] Despite the DMH's failure to base their findings on a legal standard, the terms "brutal" and "inhumane" have nevertheless been defined under Missouri law. "Brutal" is defined as "grossly ruthless or unfeeling." *Jenkins v. Bryles,* 802 S.W.2d 177, 182 (Mo.App. S.D.1991). "Inhumane" is defined as "lacking pity, kindness or mercy; savage." *Id.*

The record is devoid of any evidence supporting a finding that Oakes' conduct towards C.K. was brutal or inhumane. As conceded by counsel for DMH in oral argument, C.K. received no injuries from the incident. While Oakes did grab C.K.'s hair, she did so in response to C.K.'s vicious biting attack. The evidence shows that Oakes attempted to stop the biting attack as best she could without injuring C.K. There was no evidence that Oakes did so in a "grossly ruthless or unfeeling" manner. Neither was there evidence that Oakes' conduct was "savage" or "lacking pity, kindness or mercy." Therefore, Oakes' conduct in pulling C.K.'s hair under these circumstances was not brutal or inhumane as defined under Missouri law.

Neither do we find that the spitting was brutal or inhumane. The evidence shows that while C.K., a much larger woman, was hitting, biting and pulling Oakes' hair, she also spit in Oakes' face. Oakes instinctively spit back. While this school-yard behavior is clearly reprehensible, we do not find on the present record that it rises to the level of brutality or inhumaneness as defined under Missouri law. There was no showing that Oakes' actions were "grossly ruthless or unfeeling." The evidence shows that the spitting was reflexive and that Oakes regretted doing it. Neither was there a showing that Oakes was being "savage" or "lacking pity, kindness or mercy." The evidence is clear that Oakes was not the attacker; rather she was the victim and was simply trying to protect herself without injuring her mentally disabled attacker. In the process of doing this, she reflexively spit back when she was spit upon. This puerile behavior does not rise to the level of being brutal or inhumane.

### Reasonable force

The DHM also found that Oakes used more force than was reasonably necessary in defending herself against C.K.'s attack. Nevertheless, there was no evidence of a standard of care or what amount of force was reasonable in the context of this case. The finding is without evidentiary support and is therefore baseless.

### Conclusion

The DMH's decision finding Oakes culpable of physical abuse is unsupported by competent and substantial evidence. This is apparent from the paucity of evidence to support its findings. The DMH's decision is also arbitrary and capricious as it appears to rely more on the personal whim of its Executive Director rather than on appropriate legal definitions, standards and analysis. Given the evidence, this Court is baffled at how the DMH reached a finding

2. In essence, Bowers applies a personal *ad hoc* standard. To do so is patently arbitrary, capricious, and unreasonable.

of physical abuse. We therefore affirm the judgment of the Circuit Court of Audrain County and order the DMH to rescind its findings of "physical abuse" and remove Oakes' name from the DMH Disqualification Registry, the Family Safety Care Registry and any and all other registries on which Oakes' name has been placed by virtue of the DMH Decision. We further grant Oakes' motion for attorney's fees in the amount of $14,414.73.

KATHIANNE KNAUP CRANE, P.J., concurs.

ROBERT G. DOWD, JR., J., concurs in result.