Catherine Ann STONE, Respondent,

v.

MISSOURI DEPARTMENT OF
HEALTH AND SENIOR
SERVICES, Appellant.

No. SC 91219.

Supreme Court of Missouri,
En Banc.

July 19, 2011.

Edwin R. Frownfelter, Attorney General's Office, Jefferson City, for Appellant.

Mariam Decker and Julia S. Grus, Oliver Walker Wilson, Columbia, for Respondent.

PATRICIA BRECKENRIDGE, Judge.

Catherine Ann Stone seeks review of the decision of the Department of Health and Senior Services to place her on the employee disqualification list (EDL) for 18 months after it found that she knowingly abused a patient. She argues that there was insufficient evidence to support the decision because expert testimony is required to prove that she knowingly abused a patient with dementia and mental disabilities. She also argues that the department deprived her of due process of law by allegedly failing to provide notice of a violation of 19 CSR 30–88.010(13) and (21) before finding her in violation of this regulation.

The department's lay witnesses' testimony was substantial and competent evidence that Ms. Stone knowingly abused a patient when she physically restrained the patient in an attempt to force-feed medication to the patient. In addition, the department provided her with notice of her violations. Although the regulation mentioned in the hearing officer's findings was not cited in the notice to Ms. Stone of her placement on the EDL, the regulation was not the basis of the department's decision. Therefore, her due process rights were not violated. The decision of the department is authorized by law and supported by substantial and competent evidence. The judgment of the trial court reversing that decision, therefore, is reversed.

**Factual and Procedural Background**

Ms. Stone is a licensed practical nurse. She was employed as a charge nurse at Maries Manor, a skilled nursing facility in Vienna, Missouri. On November 3, 2007, she was in the dining room dispensing medication to patients. One patient who required medication was K.S. K.S. was diagnosed with dementia and mental disabilities, described as mental retardation. K.S. often would become agitated and combative when her medication was administered. She would hit, kick, bite, scream, and curse.

K.S.'s individualized care plan, located near the nurses' station, instructed nurses to leave K.S. alone if she reacted negatively to a nurse attempting to give her medication. Her individualized care plan directed health care providers to walk away or have K.S. removed from the area and taken to her room until she calmed down. The nurse was to attempt to administer the medication later or ask someone else to make an attempt.

When Ms. Stone attempted to administer medication to K.S. on November 3, K.S. knocked the wooden medication spoon away. K.S. swung her right hand and arm and hit Ms. Stone in her left shoulder.

Ms. Stone instructed Penny Foster, a nursing assistant, to restrain K.S.'s arm to prevent K.S. from hitting Ms. Stone again. Ms. Stone then forced medication into K.S.'s mouth with a small, wooden ice cream spoon while pushing her head forcefully against her wheelchair.

Andrea Delinger, a dietary aid at the facility, was present in the kitchen of the dining room when the incident began. She came out of the kitchen when she heard K.S. screaming differently than usual and observed Ms. Stone restraining K.S. and forcing medication into her mouth. She saw that K.S. was crying and screaming and was very upset and scared. She refused Ms. Stone's direction to remove K.S. from the dining room and was able to calm K.S. so she could be fed. She and Ms. Foster reported the incident to Joy Gunter, director of nursing of the facility, on November 7, 2007. Ms. Stone was suspended immediately.

Ms. Gunter spoke to K.S., who did not remember the incident and stated that she did not like taking her medication. After the facility's investigation, Ms. Gunter concluded that "there was restraint posed upon [K.S.] creating safety, health possible harm." Maries Manor terminated Ms. Stone on November 8, 2007.

After a call was placed to the department's central registry hotline on November 7, 2007, Mary Jane Garbin, a department facility investigator, began investigating the abuse allegation. Ms. Garbin concluded that Ms. Stone held K.S. inappropriately to give her medication and that Ms. Stone's actions constituted abuse.

The department sent Ms. Stone a notice of violation on February 19, 2008. The notice informed Ms. Stone that the department intended to place her name on the EDL for 18 months. The EDL is a record of the names of person who are or who have been employed in any facility and who have been finally determined by the department to have recklessly or knowingly abused or neglected a resident in violation of section 198.070.13.[1] All persons, corporations, organizations, or associations that receive the EDL are prohibited from knowingly employing any person who is on the EDL. Section 660.315.12.

Ms. Stone challenged the department's decision to place her name on the EDL and requested a hearing, which was conducted August 28, 2008. At the hearing, Ms. Garbin, Ms. Gunter, Ms. Foster, and Ms. Delinger testified on behalf of the department. Ms. Stone and Deborah Kay Pruitt O'Shey, a licensed practical nurse at Maries Manor, testified on Ms. Stone's behalf.

Ms. Garbin testified about her investigation as director of nursing for Maries Manor and the interviews she conducted with Maries Manor staff, including Ms. Delinger, Ms. Foster, and Ms. Stone. Ms. Garbin testified that she found Ms. Delinger and Ms. Foster credible because their interviews matched their written reports that had been submitted to the facility and provided to Ms. Garbin. Ms. Garbin did not interview K.S. because of her cognitive state. Ms. Garbin did review her medical records, which show that K.S. is a difficult resident who yells and hits staff members. After her investigation, Ms. Garbin concluded that Ms. Stone held K.S. inappropriately to give her medicine. She testified that she believed that Ms. Stone's actions constituted abuse. When asked if she believed if Ms. Stone's actions toward K.S. caused harm to her, she said, "I don't believe there was any harm."

1. All statutory citations are to RSMo Supp. 2010 unless otherwise indicated.

Ms. Gunter testified regarding her investigation for the department. She testified that K.S.'s care plan, located near the nurses' station, instructed nurses to leave K.S. alone if she reacted negatively to a nurse attempting to give her medication. Her individualized care plan required health care providers to walk away or have K.S. removed from the area and taken to her room until she calmed down. The nurse was to attempt to administer the medication later or ask someone else to make an attempt. Ms. Gunter also stated that Ms. Stone had received training on resident abuse and residents' rights. Ms. Gunter said that Sandra Zimmer, a licensed practical nurse, was present in the dining room during the incident and she stated that she did not see any contact between Ms. Stone and K.S. Ms. Gunter also testified that she was not aware of any conflicts between Ms. Stone and Ms. Delinger.

Penny Foster testified that Ms. Stone instructed her to hold K.S.'s hand down. Ms. Foster stated that K.S. seemed upset. Ms. Foster testified that K.S. routinely tried to spit out her medicine. Ms. Foster witnessed K.S. hit Ms. Stone repeatedly. K.S. also attempted to "buck" herself out of her wheelchair. Ms. Foster testified that K.S. did not want to take her medicine and was in a bad mood that day:

Administrative Law Judge: Alright. And did you perceive that [K.S.] was upset by the actions of Ms. Stone and by herself was that the reason of her [angst] or was it because she didn't want to take her medication?

Ms. Foster: She just didn't want to take her medication. She was in a bad mood that day.

She testified that, in situations in which K.S. was combative, other nurses would walk away from K.S. and return to her to administer medication after she had calmed down. Ms. Foster admitted that she received a two-day suspension for failing to immediately report the incident to her supervisor.

Ms. Delinger testified that she was in the kitchen and heard K.S. screaming. K.S. frequently screamed, but her screaming was louder than normal, so Ms. Delinger stepped out of the kitchen. Ms. Delinger observed Ms. Stone forcefully holding K.S.'s forehead and pushing her head against her wheelchair and Ms. Foster holding K.S.'s arm. She saw Ms. Stone "force" medicine into K.S.'s mouth. Ms. Delinger testified that she observed that K.S. was "very, very upset. She was screaming, she was crying, she was being combative. You could tell that she was very scared. It was very upsetting." Ms. Delinger instructed Ms. Stone to let K.S. calm down. Ms. Stone wanted K.S. removed from the dining room, but Ms. Delinger refused to let K.S. be removed. She soothed K.S. and got her to finish eating her meal. Ms. Delinger received a two-day suspension for waiting two days before reporting the incident.

Ms. Stone testified that she and Ms. Delinger had had a disagreement the day before the incident with K.S. Ms. Stone had requested food for a patient with low blood sugar and Ms. Delinger refused to give her food. Ms. Stone testified that she wrote up Ms. Delinger for this behavior.

Ms. Stone also testified that, on the evening of November 3, she approached K.S. with her medication. K.S. struck her in her left arm with enough force to cause a large bump. She stated that her left arm was immediately in pain and that she could not have used it to forcefully hold back K.S.'s forehead. She denied forcing medication into K.S.'s mouth. She testified that Ms. Foster was patting K.S.'s arm, not restraining it. Ms. Stone asked Ms. Foster and other aides to take K.S.

back to her room. Ms. Delinger refused to let K.S. leave. Ms. Stone wrote a complaint about Ms. Delinger's usurping her authority and slid it under Ms. Gunter's door. She also noted that she recorded K.S.'s refusal of medication in her medical record.

Ms. Stone said that the patients' care plans were not readily available to the nurses. Regarding K.S.'s individualized care plan, she stated, "I was told that if she was extremely upset to disassociate her for 15 minutes. If she could be taken to her room or to a quiet place to calm down." She said that the only training she received on resident abuse and residents' rights was "a piece of paper." She denied abusing K.S. and forcing medication into her mouth.

As a witness on Ms. Stone's behalf, Ms. O'Shey testified about K.S.'s combative behavior. She testified that it was a "two-handed function" to get the medication in K.S.'s mouth because K.S.'s medication is crushed and placed in apple sauce or Jell-O and then spoon-fed to K.S. Ms. O'Shey stated that K.S.'s family requested that K.S. be administered her medication if at all possible. Ms. O'Shey testified that K.S. had to be restrained previously to have her weekly blood-sugar-level test. She also stated that K.S. was to be given 15 minutes to calm down when she became agitated.

On October 28, 2008, the hearing officer issued his decision and order affirming the department's decision. He found that a preponderance of the evidence indicated that Ms. Stone knowingly abused K.S. He found that Ms. Stone's version of the incident was not persuasive and that, rather than holding K.S. in a defensive position, Ms. Stone acted aggressively by restraining K.S. and forcing medication into her mouth. He concluded that K.S. did not sustain any physical injuries but that a finding of abuse did not require a finding of physical injuries. He found that K.S.'s responses to Ms. Stone restraining her were "clear indications that [K.S.] was experiencing emotional harm and distress because of the staff's actions." He found that the department provided substantial and competent proof that Ms. Stone should be placed on the EDL for a period of 18 months.

Ms. Stone filed a petition for judicial review in the circuit court. The circuit court reversed the decision of the department. The department appealed and, after opinion by the court of appeals, this Court granted transfer. Mo. CONST. art. V, sec. 10.

## Standard of Review

■ Article V, section 18 of the Missouri Constitution authorizes judicial review of agency decisions, which includes the department's decisions. Judicial review includes the determination whether the decision is authorized by law, "and in cases in which a hearing is required by law, whether [the decision is] supported by competent and substantial evidence upon the whole record." Mo. CONST. art. V, sec. 18. An appellate court reviews the decision of the agency rather than the decision of the circuit court. *Klein v. Mo. Dep't of Health & Senior Servs.*, 226 S.W.3d 162, 164 (Mo. banc 2007); Section 536.140.2. Section 536.140.2 lists several criteria for judicial review of an agency decision. The appellate court reviews whether the agency action:

(1) is in violation of constitutional provisions;

(2) is in excess of the statutory authority or jurisdiction of the agency;

(3) is unsupported by competent and substantial evidence upon the whole record;

(4) is, for any other reason, unauthorized by law;

(5) is made upon unlawful procedure or without a fair trial;

(6) is arbitrary, capricious or unreasonable; .

(7) involves an abuse of discretion.

Section 536.140.2.

Under article V, section 18 and section 536.140.2, the standard of review for administrative decisions is "whether, considering the whole record, there is sufficient competent and substantial evidence to support the [agency's decision]." *Albanna v. State Bd. of Registration for Healing Arts*, 293 S.W.3d 423, 428 (Mo. banc 2009). The evidence is *not* viewed in the light most favorable to the agency's decision. *Id.; Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. banc 2003) (emphasis added). A decision that "is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." *Hampton*, 121 S.W.3d at 223.

Regarding credibility determinations, this Court defers to the administrative law judge's credibility determinations and the weight given to evidence. Section 536.140.3. *See also Lagud v. Kansas City Bd. of Police Comm'rs*, 136 S.W.3d 786, 796 (Mo. banc 2004). This Court will not substitute its judgment for that of the administrative law judge on factual matters. *State Bd. of Registration for the Healing Arts v. McDonagh*, 123 S.W.3d 146, 152 (Mo. banc 2003). When the agency's decision involves a question of law, the Court reviews the question de novo. *Albanna*, 293 S.W.3d at 428. *See also* section 536.140.3.

## Expert Testimony Not Required to Prove Knowing Abuse

Ms. Stone first claims that the hearing officer's conclusion that her actions constituted abuse against K.S., which is defined by section 198.006(1), is arbitrary and capricious and not supported by a preponderance of substantial and competent evidence in that there is no evidence that she caused any physical or emotional harm to K.S. Specifically, Ms. Stone argues that because K.S. has dementia and is a person with mental disabilities, expert testimony was necessary to substantiate any finding that K.S. suffered emotional harm or injury. She asserts that expert testimony was necessary for the department to meet its burden to prove that Ms. Stone abused K.S. and for the fact finder competently to find Ms. Stone caused emotional harm. Therefore, the department erroneously placed her name on the EDL.

To be placed on the EDL, the department needed to prove, and the hearing officer needed to find, that Ms. Stone knowingly or recklessly abused a resident of a licensed facility while employed at that facility. Section 198.070.13. This case turns on whether Ms. Stone's conduct on November 3, 2007, rose to the level of "abuse" required by section 198.006(1). Section 198.006(1) defines abuse as "the infliction of physical, sexual, or emotional injury or harm." The statute does not define "injury or harm."

Although section 198.006(1) does not define "emotional injury or harm" and the phrase has not been interpreted by case law, this Court's interpretation of the phrase "physical injury or harm" is instructive. *Klein*, 226 S.W.3d at 163. In *Klein*, two eyewitnesses testified that a nursing home employee yelled at an 85–year–old, wheelchair-bound patient and then hit her on the crown of her head four or five times. *Id.* at 163. One witness described the patient as trying to get away from the employee. *Id.* This Court stated that "[s]triking a nursing home resident

necessarily involves physical injury or harm." *Id.* at 164. Furthermore, the Court concluded that there is a "low threshold for establishing the infliction of physical injury or harm." *Id.* Under *Klein,* long-term, lingering or residual injury is not required to find "abuse" as defined by section 198.006(1); "the statute does not require a physical manifestation of injury or harm." *Id.* Therefore, "the [department's decision] was supported by competent and substantial evidence upon the whole record and was authorized by law." *Id.* This low threshold for establishing the infliction of physical harm or injury applies equally to proof of emotional harm or injury. The evidence necessary to meet the low threshold required by section 196.006(1) and the *Klein* analysis does not require expert testimony.

■ Ms. Stone's hearing was subject to the applicable provisions of the Missouri Administrative Procedures Act (MAPA), specifically sections 536.070 to 536.080, RSMo 2000. MAPA relaxes the rules of evidence that normally apply in civil cases. "While contested administrative proceedings are not required to follow the 'technical rules of evidence,' the 'fundamental rules of evidence' applicable to civil cases also are applicable in such administrative hearings." *McDonagh,* 123 S.W.3d at 154. "The standards for admission of expert testimony constitute such a fundamental rule of evidence." *Id.* at 154–55.

Section 490.065, RSMo 2000, governs the admissibility of expert testimony in civil cases. Section 490.065.1 states, in part:

In any civil action, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

By the plain language of section 490.065.1, expert testimony is permissive, but not necessary, when the expert's scientific, technical, or other specialized knowledge will assist the trier of fact with understanding the facts at issue.

■ Expert testimony may be admitted when the topic at issue is one with which lay witnesses and fact finders are unfamiliar. *Roy v. Missouri Pacific Railroad Co.,* 43 S.W.3d 351, 365 (Mo.App. 2001). Expert testimony should be only "on those subjects about which the [fact finder] lacks experience or knowledge and which will assist the [fact finder][.]" *Id.* *See also Kivland v. Columbia Orthopaedic Grp., LLP,* 331 S.W.3d 299, 311 (Mo. banc 2011). When a fact at issue is so technical or complex that no fact finder could resolve the issue without expert testimony, expert testimony is "necessary" and, therefore, required. *Housman v. Fiddyment,* 421 S.W.2d 284, 289 (Mo. banc 1967); *Ponciroli v. Wyrick,* 573 S.W.2d 731, 735 (Mo.App.1978). For example, expert testimony has been required to explain the results of medical tests and blood work, *State v. Endicott,* 732 S.W.2d 239, 241–42 (Mo.App.1987), to explain the medical standard of care and breach of that duty in a medical malpractice case, *Hickman v. Branson Ear, Nose & Throat, Inc.,* 256 S.W.3d 120, 124 (Mo. banc 2008), or to establish causation when there is a sophisticated injury that involves a highly scientific technique for diagnosis. *Sundermeyer v. SSM Reg'l Health Servs.,* 271 S.W.3d 552, 554 (Mo. banc 2008); *Super v. White,* 18 S.W.3d 511, 516 (Mo.App.2000). It is within the adjudicator's discretion to determine the "necessity" of the expert testimony. *Housman,* 421 S.W.2d at 289.

■ In contrast, "a lay witness can testify as to what he hears, feels, tastes, and smells, as well as [to] what he sees."

*Roy*, 43 S.W.3d at 359. *See also State ex rel. Nixon v. Telco Directory Publ'g*, 863 S.W.2d 596, 599 (Mo. banc 1993). Generally, a witness must state facts from which the fact finder is to form his or her opinion. *Stephens v. Kansas City Gas Co.*, 354 Mo. 835, 191 S.W.2d 601, 606 (1946). If the fact at issue is "open to the senses," the opinion of lay witness is admissible. *Beuttenmuller v. Vess Bottling Co. of St. Louis*, 447 S.W.2d 519, 526 (Mo.1969). "[A] fact finder may draw conclusions about a person's mental or emotional condition based on evidence of the person's actions and behaviors." *White v. Moore*, 58 S.W.3d 73, 77 (Mo.App.2001). This evidence may come from lay witnesses describing the conduct of the affected person. *Id.* To that effect, lay witnesses have been allowed to testify to the matters that are, in part, conclusions. *Beuttenmuller*, 447 S.W.2d at 526.

Ms. Stone asserts that the fact at issue—whether K.S. was abused—is beyond the common experience or knowledge of a lay person and that expert testimony was a necessity and, therefore, required. Ms. Stone also asserts that because K.S. was not an "ordinary person" but a person with mental disabilities and dementia, a lay witness or fact finder would not be able to determine that K.S. suffered emotional harm or distress. She asserts that a lay person would not be able to make a determination of emotional harm through the observation of the reactions of a person with mental disabilities and dementia. In support of this assertion, she relies on *State ex rel. Dean v. Cunningham*, 182 S.W.3d 561 (Mo. banc 2006).

*Dean* decides whether the plaintiff in a sexual discrimination lawsuit who sought damages for emotional distress and humiliation waived her physician-patient privilege. *Id.* at 567–569. In that case, before finding that the plaintiff did not place her mental condition in controversy, the Court stated, "She may, however, seek damages for emotional distress of a generic kind— that is, the kind of distress or humiliation that an ordinary person would feel in such circumstances. These damages are generally in the common experience of jurors and do not depend on any expert evidence." *Id.* at 568. Ms. Stone mischaracterizes this language to claim that only an "ordinary" person's emotional harm is within a lay fact finder's common experience. *Dean* does not support this proposition. The question whether a person with mental disabilities suffered emotional or physical abuse is not beyond the common experience of a lay person.

Unlike complex medical standards of care, highly scientific medical tests, or a diagnosis of a complex medical condition, the issue of whether a person with dementia and mental disabilities suffers the level of emotional harm contemplated by section 198.006(1) is not a sophisticated injury that requires highly scientific information or a complex diagnosis. A lay witness could testify about his or her perceptions of the person suffering emotional harm. Moreover, a fact finder does not need a sophisticated explanation of the victim's reaction to competently render a proper decision about whether abuse occurred as defined by section 198.006(1). Therefore, it was not necessary for the department to present expert testimony as to whether Ms. Stone's actions constituted abuse.

 In Ms. Stone's continuing effort to show that the hearing officer's decision is not supported by a preponderance of competent and substantial evidence, she next contends that the department failed to prove by expert testimony that she "knowingly" abused K.S. and "knowingly" acted outside the "standard of care" for a licensed practical nurse. She states that she only was administering ordered medi-

cations and that a lay person could not judge whether her actions were reasonable. Ms. Stone asserts that the department provided no evidence of the "standard of care" that she was to provide to K.S. if she became uncooperative and would not take her medicine and that she did not have actual knowledge of any care plan.

Ms. Stone relies on *Oakes v. Mo. Dept. of Mental Health,* to support her argument. 254 S.W.3d 153 (Mo.App.2008). *Oakes* involved a health care provider attempting to get a combative resident out of street traffic. *Id.* at 155. During the incident, the health care provider, Ms. Oakes, pulled the resident's hair and instinctively spit on the resident immediately after the resident spat on her. *Id.* The Department of Mental Health found that Ms. Oakes committed physical abuse of the patient by purposefully treating her in a "brutal and inhumane manner." *Id.* at 157. The court of appeals disagreed and reversed the department's decision. Ms. Stone cites the court of appeals' conclusion regarding the sufficiency of the evidence in *Oakes* to support her argument that to prove abuse there must be evidence of a "standard of care" that was breached. The statement of the court on which she relies is:

> The [Department of Mental Health] also found that Oakes used more force than was reasonably necessary in defending herself against [the resident's] attack. Nevertheless, there was no evidence of a *standard of care* or what amount of force was reasonable in the context of this case. The finding is without evidentiary support and is therefore baseless.

*Id.* at 158 (emphasis added). The court of appeals' statement is a reference to the lack of sufficient evidence to support the Department of Mental Health's finding that Ms. Oakes had used more force than was reasonably necessary to defend herself against the resident's attack. *Id.* In its opinion, the court only mentioned "standard of care" once, and it did not define the term. *See id.* Such reference does not support Ms. Stone's assertion that "standard of care" evidence is required to prove abuse as defined by section 198.006(1).

Moreover, unlike *Oakes,* where no "standard of care" existed for the situation of a resident in the street, K.S.'s individual care plan specifically addressed how Ms. Stone was to proceed in this situation. The department put forth ample evidence of the applicable "standard of care" through the testimony of Ms. Foster, Ms. Delinger, and Ms. Gunter about K.S.'s individualized care plan. K.S.'s care plan specifically addressed how a health care provider should proceed if K.S. became combative and refused to take her medication. Ms. Gunter, the director of nursing at Maries Manor, testified that Ms. Stone had access to K.S.'s care plan and that, as a nurse, Ms. Stone was responsible for knowing what was in K.S.'s care plan because "that is a part of nursing care that you know how to take care of that resident." Even Ms. Stone's witness, Ms. O'Shey, testified that the proper way to deal with K.S. when she refused her medication was to "try giving [her] kind of a time out and help her calm down" by removing her from the room and trying to administer the medication later. This testimony shows that Ms. Stone should have known K.S.'s care plan and that using force to give K.S. her medication was contrary to K.S.'s individual care plan. More importantly, the record contains Ms. Stone's admission that she was told the substance of the directives in the care plan, even if she had not read the written plan. In fact, in the department's hearing, her defense was that her actions were consistent with K.S.'s individual care plan.

Ms. Stone further asserts that the department needed to present expert testimony regarding Ms. Stone's mental state. The hearing officer found that Ms. Stone acted "knowingly." A person acts "knowingly" "when a reasonable person should be aware of the result caused by his or her conduct." Section 198.070.13.

Expert testimony was not necessary to establish Ms. Stone's culpable mental state. A person's intent most often is proved by circumstantial evidence and "may be inferred from surrounding facts or the act itself." *State v. Oliver*, 293 S.W.3d 437, 446 (Mo. banc 2009). Determining whether a person acted "knowingly" is not outside the realm of common experience, and fact finders often determine a party's mental state absent the aid of expert testimony. *E.g. id.* Therefore, expert testimony was not necessary to prove Ms. Stone's intent.

### Substantial and Competent Evidence of Knowing Abuse

██ The department, through lay witness testimony, presented substantial and competent evidence that Ms. Stone abused K.S. The lay witnesses testified about facts that were "open to the senses," specifically K.S.'s general temperament and individualized care plan, Ms. Stone's actions on November 3, and K.S.'s reaction to Ms. Stone. Ms. Foster, Ms. Delinger, and Ms. Stone were all present in the dining room during the incident. Each eyewitness testified to what she observed that evening. Ms. Foster testified that Ms. Stone pushed her hand on K.S.'s forehead while forcing medication into her mouth. Ms. Foster also testified that K.S. became very upset and tried to "buck" herself out of her wheelchair. Ms. Delinger stated that she observed Ms. Stone forcing medication into K.S.'s mouth while pushing K.S.'s head forcefully against her wheelchair. Ms. Delinger testified that K.S. seemed "very, very upset" and was screaming and crying.

Both Ms. Foster and Ms. Delinger testified that they were familiar with K.S. and her combativeness as well as her aversion to taking her medicine. Both testified about the protocol the Maries Manor staff was directed to follow when K.S. became combative and refused to take her medication.

The hearing officer also could consider all of the witnesses written statements about the incident. In Ms. Foster's written statement, she states, "I witnessed [Ms.] Stone holding [K.S.'s] forehead forcing medicine into her mouth." Ms. Delinger's written statement reads:

I heard [K.S.] screaming I came out to the dining room from the kitchen to see [Ms. Stone] forcefully pushing [K.S.'s] head back against her wheelchair and holding it there to force meds in her mouth. [Ms. Stone] had [Ms. Foster] to hold [K.S.'s] good arm to keep from getting hit. She wouldn't stop even though [K.S.] was spitting the meds out. When she finally stopped, I cleaned [K.S.] back up and calmed her back down.

The department also presented Ms. Garbin, a department investigator, as a witness. Although she was not an eyewitness to the November 3 incident, she testified about her investigation and her interviews with the Maries Manor staff. She testified that Ms. Delinger's and Ms. Foster's accounts of the incident in their written statements were consistent with their statements in interviews, while Ms. Stone's accounts of the incident in her written statement and interviews were not consistent.

Based on this evidence, the hearing officer then found that when K.S. refused her medication, Ms. Stone physically re-

strained her, albeit minimally, and forced medication into her mouth, which constituted knowing abuse of K.S. Ms. Stone asserted before the hearing officer that because K.S. did not suffer physical injury, no abuse occurred. The hearing officer correctly found that, under *Klein*, a finding of abuse does not require a physical manifestation of injury or harm. 226 S.W.3d at 164. The hearing officer expressly rejected Ms. Stone's contention that she used restraint only to defend herself from K.S.'s flailing limbs. He found that Ms. Stone used the restraint to forcibly medicate K.S. The hearing officer found that K.S.'s response to Ms. Stone's actions—her yelling, spitting, and fighting—were "clear indications that [K.S.] was experiencing emotional harm and distress because of [Ms. Stone's] actions." Therefore, the hearing officer concluded that Ms. Stone knowingly inflicted emotional injury or harm to K.S., and that the department appropriately placed Ms. Stone on the EDL for 18 months.

The record also contains substantial evidence that Ms. Stone acted knowingly. The evidence shows that Ms. Stone knowingly pushed K.S.'s head into her wheelchair and forced medication into her mouth. A reasonable person should be aware that restraining the head of K.S., a mentally disabled person, and attempting to force medication into her mouth would cause physical or emotional harm or injury, especially when K.S.'s history of becoming upset and refusing medication was so significant that an individual care plan was developed to instruct health care providers how to deal with her refusal. Ms. Stone knowingly disregarded the care plan, and a reasonable person should have known that deviating from K.S.'s care plan, could cause physical or emotional harm to K.S. The hearing officer's finding that Ms. Stone knowingly abused K.S. is

supported by substantial and competent evidence.

Ms. Stone claims that the evidence she presented outweighs the department's evidence and, therefore, the department did not prove by a preponderance of substantial and competent evidence that she abused K.S. While Ms. Stone presented evidence that contravenes the hearing officer's finding of abuse, that evidence does not overwhelmingly outweigh the substantial evidence of abuse put forth by the department. *Hampton*, 121 S.W.3d at 223. Her evidence is inconsistent and is unpersuasive, particularly when considering the credibility of the witnesses.

Ms. Stone first points to her impeachment testimony regarding Ms. Delinger. Ms. Stone testified that on the day before the incident, she and Ms. Delinger had had a disagreement about a patient's care and Ms. Stone had reported Ms. Delinger's insubordination. Ms. Delinger, however, testified that she did not interact much with Ms. Stone and that they did not have any disagreements. Moreover, Ms. Garbin, the department's investigator, stated that she was not told during the investigation of any conflicts between Ms. Stone and Ms. Delinger.

Ms. Stone also highlights her denials of abuse. Ms. Stone's conflicting accounts of the November 3rd incident undermine her argument. In her written statement, Ms. Stone claimed that she never touched K.S. and that Ms. Foster only held K.S.'s head to prevent her from hurting herself: "I never placed hands on [K.S.] and the aides were only attempting to keep her from hurting herself as she was throwing herself forward and out of her chair." She also stated that she attempted to give K.S. her medicine and that when K.S. became uncooperative, she did not continue. In a phone interview with Ms. Garbin, however, she stated that she did hold K.S. but she

was just trying to protect K.S. from throwing herself from the wheelchair. At the hearing, Ms. Stone contended that her actions were a natural defensive response to K.S.'s combative behavior.

On appeal, Ms. Stone attempts to defend her actions on November 3 by claiming that K.S. was the aggressor and her actions were defensive, a concept that the hearing officer expressly rejected. She compares her actions to those of the health care provider in *Oakes,* 254 S.W.3d at 153. As previously noted, in *Oakes,* a resident of an independent supported living facility ran into a street and began throwing rocks at the staff. *Id.* at 155. Ms. Oakes, a health care provider at the facility who had been physically assaulted by the resident on five other occasions, ran into the street after the resident. *Id.* The resident then grabbed Oakes's hair, bit her, and spit in Oakes's face. *Id.* "Instinctively, Oakes spit back." *Id.* The court of appeals found that Oakes's actions were "instinctive" or "reactive" and concluded that there was no evidence to support the agency's finding of physical abuse. *Id.* at 157, 159.

Unlike Ms. Oakes's actions, Ms. Stone's actions were not merely reflexive. Her actions were aggressive. Although K.S. was documented as being combative and not taking her medicine, Ms. Stone chose to physically restrain K.S. and to attempt to force medication into her mouth. K.S. did not begin attacking Ms. Stone like the resident in *Oakes.* Rather, K.S. began to react violently once Ms. Stone began to restrain her. Unlike the situation in *Oakes,* this situation presented no urgency. Ms. Stone did not need to administer K.S.'s medication at that exact moment. She should have followed K.S.'s care plans and attempted to administer the medication later. In this situation, Ms. Stone knowingly decided to force-feed medication

despite K.S.'s violent reaction, and her restraint in attempting to do so, amounted to abuse.

Finally, although the hearing officer did not explicitly find Ms. Stone lacked credibility, his findings imply that he did not find her credible. His decision and order states: "[Ms. Stone's] claim that the restraint utilized was necessary to defend against the resident's attack was not persuasive. The restraint used was to facilitate [Ms. Stone's] attempt to forcefully medicate resident, [K.S.] against [K.S.'s] will, thus making the restraint an aggressive posture and not defensive." The hearing officer expressively disbelieved Ms. Stone's theory that her actions were defensive. In resolving the conflicts in the testimony about the November 3rd incident, the hearing officer chose to believe certain evidence and disbelieve other evidence. Absent a finding that the evidence actually was uniform and to the same effect, this Court will not disturb the hearing officer's credibility findings and implicit rejection of some evidence. *Gen. Motors Corp. v. Fair Emp't Practices Div. of the Council on Human Relations of the City of St. Louis,* 574 S.W.2d 394, 399 (Mo. banc 1978). Ms. Stone's testimony that her actions were defensive and not abusive does not overwhelmingly contradict the substantial evidence that supports a finding of abuse.

### Due Process Violation

▪ Ms. Stone also asserts that the department violated her due process rights by failing to provide notice of a violation of 19 CSR 30–88.010(13) and (21) before finding her in violation of this regulation. The relevant portion of 19 CSR 30–88.010(13) states, "Each resident shall be afforded the opportunity to . . . refuse treatment[.]" 19 CSR 30–88.010(21) states, "The exercise of resident rights shall be free from re-

straint, interference, coercion, discrimination or reprisal." She states that the notice of violation letter cited to only section 198.070 and did not reference 19 CSR 30–88.010(13) and (21). Therefore, when the department allegedly found that she violated 19 CSR 30–88.010(13) and (21), it deprived her of procedural due process.

 The Missouri and United States constitutions both prohibit states from depriving a person of a property interest without due process of law. U.S. CONST. AMEND. 14; Mo. CONST. art. I, sec. 10. A person has a property right in a license that requires sufficient procedural due process before the license can be "impaired, suspended, or revoked." *Mo. Real Estate Comm'n v. Rayford*, 307 S.W.3d 686, 692 (Mo.App.2010). Moreover, "[t]he right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference, implicates constitutionally protected liberty interests." *See Jamison v. Dep't of Soc. Serv.*, 218 S.W.3d 399, 407 (Mo. banc 2007) (internal citations omitted). If the government wishes to deprive a person of a liberty or property interest, due process requires the government to provide notice and the opportunity for a meaningful hearing appropriate to the nature of the case. *Strup v. Dir. of Revenue*, 311 S.W.3d 793, 796 (Mo. banc 2010). "Due process [requires] notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *State v. Elliott*, 225 S.W.3d 423, 424 (Mo. banc 2007).

The applicable portions of the notice of violation letter state:

[Y]ou are hereby notified as required by Section 660.315, RSMo, that the [department] intends to place your name for a period of eighteen months on a list of employees who have recklessly or knowingly abused or neglected a resident.

This list, called the Employment Disqualification List (EDL), is a record of the names of persons … who have been finally determined by the [department] to have recklessly or knowingly abused or neglected a resident, in violation of Section 198.070, RSMo.

The notice of violation letter does not cite to any regulations.

The hearing officer's decision and order briefly mentions 19 CSR 30–88.010(13) and (21) in support of the proposition that K.S. had the right to refuse the administration of medicine and the right to be free of restraint and coercion. The decision and order contains eight conclusions of law with citations to sections 198.006(1), the definition of "abuse," and section 198.070.13, the requirement to maintain an EDL. It does not cite to 19 CSR 30–88.010(13) and (21). Reading the hearing officer's decision and order as whole, it is clear that he based his decision on violations of sections 198.006(1) and 198.070.13 and not on violations of 19 CSR 30–88.010(13) and (21). Ms. Stone had notice of her charges and, therefore, she was not deprived of procedural due process.

### Conclusion

Viewing the record as a whole, the department provided substantial and competent evidence by presenting lay witness testimony that Ms. Stone knowingly abused K.S. Moreover, Ms. Stone's due process rights were not violated because the hearing officer found that Ms. Stone knowingly abused K.S. pursuant to sections 198.006(1) and 198.070.13 and did not rely on a regulation not cited in the notice of violation letter. The department's decision to place Ms. Stone on the EDL for eighteen months is authorized by law.

The trial court's judgment reversing the decision, therefore, is reversed.

All concur.