

# MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| AARON STOCK, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | WD87329 |
| | ) | |
| POLICEMEN'S AND FIREMEN'S | ) | Filed: April 15, 2025 |
| RETIREMENT FUND OF THE | ) | |
| CITY OF RICHMOND HEIGHTS, | ) | |
| MISSOURI, | ) | |
| | ) | |
| Respondent. | ) | |

**Appeal from the Circuit Court of Cole County**
**The Honorable Jon E. Beetem, Judge**

**Before Division Two: Janet Sutton, P.J., and**
**Alok Ahuja and Mark D. Pfeiffer, JJ.**

Aaron Stock was employed as a firefighter/paramedic by the City of Richmond Heights from July 2015 to October 2021. Stock applied for duty-related disability benefits from the City's Policemen's and Firemen's Retirement Fund, based on an injury to his left wrist. The Fund's Board of Trustees found that Stock was permanently unable to perform his duties as a firefighter/paramedic, and that he was therefore disabled. The Board determined, however, that Stock's disability was not duty related. It awarded him a non-duty-related disability pension which provides lower benefit payments.

Stock filed a Petition for Judicial Review in the Circuit of Cole County.  The Circuit Court affirmed the Board's decision.  Stock appeals.  We affirm.

**Factual Background**

Stock began working as a firefighter/paramedic for the City of Richmond Heights on July 30, 2015.  On June 3, 2020, Stock missed a step when exiting from a fire truck, and fell from the truck.  He twisted his right ankle, and fell forward onto his outstretched left hand.  Stock was taken to the emergency department of a local hospital, where he was diagnosed with a possible fracture of the left wrist.  Stock was directed to follow up with an orthopedic surgeon.

Stock's left wrist injury was treated by three local physicians.  Stock first saw Dr. CB,[1] a physiatrist, who diagnosed Stock with a possible tear of the triangular fibrocartilage complex ("TFCC") in his left wrist.  At the recommendation of Dr. CB, Stock underwent an MRI of his left wrist on July 10, 2020.  The results included "severe osteoarthritis of the distal radial and ulnar joint . . . along with reactive bone marrow edema."  Dr. CB referred Stock to Dr. RRH, an orthopedist.

Dr. RRH diagnosed Stock with left wrist pain.  In his report of Stock's initial visit on July 20, 2020, Dr. RRH noted that Stock's MRI showed "negative ulnar variance, severe osteoarthritis," and a "chronically dislocated ECU [exterior carpi ulnaris]."  A "negative ulnar variance" exists where the ulna bone in an individual's forearm is abnormally shortened in relation to the radius bone.  After a steroid injection Stock was permitted to return to work with a splint and weight restrictions.

---

[1]     Pursuant to § 509.520.1(5), RSMo, we do not provide the names of any non-party witnesses in this opinion.

Stock returned to Dr. RRH the following month, and reported a decreased level of pain following the steroid injection. Two weeks later, on August 27, 2020, Dr. RRH saw Stock again. At that point, Dr. RRH's records indicate that Stock "relay[ed] to us today that he is not feeling any pain in his left wrist." Dr. RRH discontinued the splint and permitted Stock to return to work without any restrictions. One month later, on September 24, 2020, Dr. RRH's medical notes state that Stock continued to improve and was "working without issue." Dr. RRH had no further treatment recommendations, found Stock to be at maximum medical improvement, and discharged him from care.

Stock returned to Dr. RRH on December 7, 2020, complaining of pain "along the ulnar aspect of the wrist with periods increased in intensity and frequency over the last month." Stock told Dr. RRH that on November 1, 2020, Stock felt pain in his left wrist during a training exercise in which he was required to pull an anthropomorphic dummy from a window. Dr. RRH diagnosed Stock with "left wrist strain/pain, negative ulnar variance," gave him another steroid injection, and indicated that Stock should wear the splint until his next appointment. There is no record of Stock meeting with Dr. RRH again.

On December 31, 2020, Stock underwent a second MRI of his left wrist. The City's workers' compensation carrier referred Stock to Dr. RFH, an orthopedic surgeon. Stock visited Dr. RFH on January 12, 2021. Dr. RFH reported that the December 2020 MRI revealed "a partial thickness tearing of the ulnar attachment of the TFCC, 4.5 mm negative ulnar variance with findings of ulnar impingement and partial thickness tear of the volar fibers of the scapholunate ligament." Dr. RFH believed that Stock's symptoms were caused by

3

his fall from the fire truck on June 3, 2020. Dr. RFH told Stock that he had experienced an "unusually bad [TFCC] tear." Although Dr. RFH cautioned Stock that he might develop arthritis in the future because of his short ulna, Dr. RFH did not believe Stock's negative ulnar variance was the cause of his current pain.

On January 28, 2021, Dr. RFH performed a left wrist arthroscopy followed by an open repair and stabilization. In his operative findings, Dr. RFH noted that Stock had a very short ulna and had a complex TFCC tear with instability of the distal radioulnar joint and a somewhat complex anatomy. There was no mention of osteoarthritis in Dr. RFH's report.

Stock returned to Dr. RFH four months later and Dr. RFH recommended a third MRI of the left wrist. Dr. RFH described the results of the third MRI as "unremarkable."

On June 10, 2021, Stock returned to Dr. RFH, and reported that his symptoms "are worse now than they were preoperatively." Dr. RFH testified that he could not explain why Stock's pain and limitations were worse postoperatively, and that Stock was the only patient Dr. RFH had treated who had more pain and limitations after surgery. Dr. RFH noted that Stock's

> pain is unchanged and it is difficult to discern where his pain is coming from. His joint is stable, and the burning sensation should not be there at 5 months postoperative. We have already obtained an MRI of his wrist, which only showed postoperative changes. I do not have any further medical treatment recommendations other than therapy. Therefore, I recommend a second opinion at this point.

Stock then saw Dr. DB for a second opinion on June 14, 2021. According to Dr. RFH's records, Dr. DB "was unable to explain the pain as well. He recommended an MRI arthrogram, which did not provide any further reason to

4

explain his pain." A fourth MRI was performed on July 16, 2021. The radiologist's report noted "[p]rominent distal radial ulnar osteoarthritis associated with 3.5 mm negative ulnar variance."

On August 3, 2021, Stock followed up with Dr. RFH. Dr. RFH recommended physical therapy and work conditioning. By August 19, 2021, Stock had completed physical therapy and Dr. RFH placed Stock at maximum medical improvement with permanent work restrictions; based on those restrictions, Stock was unable to return to work as a firefighter. Dr. RFH testified to his opinion that Stock's disability was caused by his June 30, 2020 work injury.

On August 23, 2021, Stock applied to the Retirement Fund for a Line of Duty Disability Pension. The Fund's Board obtained medical evaluations from three outside physicians. The Board's physicians based their opinions solely on a review of Stock's medical records; none examined Stock in person.

Two of the three Board-selected physicians concluded that Stock's disability was not duty related. Dr. JC found that Dr. RFH had successfully repaired the left-wrist injury which Stock experienced as a result of his June 2020 fall. Dr. JC noted that Stock's July 10, 2020 MRI found that he had "severe osteoarthritis of the radioulnar joint." Dr. JC opined that this osteoarthritis was the "major causal factor" of Stock's pain. Similarly, a second Board-selected physician, Dr. JB, noted that Stock's medical evaluations after his June 2020 injury "revealed a congenital condition – 'profound negative ulnar variance' associated 'with severe osteoarthritis at the distal radioulnar joint.'" Dr. JB concluded that "[t]he work injuries contribute but are not causative of the ulnar

5

deformity, OA [*i.e.*, osteoarthritis] and subsequent disability." On the other hand, the third physician the Board asked to review Stock's application, Dr. LM, opined that Stock's left wrist impairment <u>was</u> directly attributable to his June 3, 2020 workplace accident.

At the request of his legal counsel, Stock then underwent a further medical examination by Dr. DV. After reviewing Stock's medical records and examining Stock in-person, Dr. DV opined that Stock's fall on June 3, 2020, was the primary and prevailing factor causing Stock's symptoms, need for treatment, and resulting disability.

The Retirement Fund's Board held a closed session on October 15, 2021, to consider Stock's application. The Board determined that Stock was disabled and unable to perform his duties as a firefighter/paramedic. The Board found, however, that Stock's disability was not duty related. The Board concluded that "the evidence established that Stock suffers from profound negative ulnar variance with severe osteoarthritis in his left wrist, and that the osteoarthritis developed over many years from a congenital condition." The Board further concluded that Stock's "conditions were not duty related nor were they the result of his injury on June 30, 2020." On the basis of those determinations, the Board awarded Stock a non-duty-related disability pension.

Stock appealed the Board's decision. Pursuant to the Board's Rules and Regulations, this appeal was heard by the Board as a contested case. Following the hearing, a hearing officer recommended that Stock's application for duty-related disability benefits be approved. The Board, however, again concluded that Stock's disability was not duty related. The Board's decision explains:

6

The medical testimony and records are unanimous concerning the existence of osteoarthritis in Stock's left wrist, a condition that the evidence establishes occurs over time, and not as the result of an acute injury like that suffered by Stock on June 30, 2020. Every treating and evaluating physician other than Dr. [CB] further noted the existence of the negative ulnar variance in Stock's left wrist, a condition that his surgeon, Dr. [RFH], identified as more severe than usual and which caused Dr. [RFH] to deviate from an arthroscopic procedure. Dr. [RFH] also made clear that from a structural standpoint, Stock's wrist was "very stable" after the procedure, despite his ongoing pain, which coincides with Dr. [DB]'s second opinion (as noted by Dr. [DV]) that the repair was intact after surgery, with no new tears. This evidence disputes the position of the Application that Stock's inability to perform his duties resulted from the June 30, 2020 injury alone. The Board agrees with the finding of Dr. [JC] and Dr. [JB] that the June 30, 2020 injury was not the cause of Stock's inability to perform his duties. The Board finds that the conclusion and testimony of those physicians who discounted the existence of the negative ulnar variance and severe osteoarthritis is less credible and reliable than those who took the presence of these significant pre-existing and long-term conditions into account.

. . . .

The evidence established that Stock suffers from profound negative ulnar variance with severe osteoarthritis in his left wrist, and that the osteoarthritis developed over many years from a congenital condition. These conditions were not duty related nor were they the result of his injury on June 30, 2020. The evidence established as a result that Stock's fall on June 30, 2020 was not the cause of his permanent inability to perform his duties as a firefighter/paramedic.

Stock filed a Petition for Judicial Review in the Circuit Court of Cole County on March 23, 2023. On June 11, 2024, the circuit court issued its judgment affirming the decision of the Retirement Fund's Board of Trustees. The judgment found that,

7

[w]hile there is . . . substantial and competent evidence in the record to support [Stock], there is also competent and substantial evidence to the contrary. The Fund simply disbelieved the treating doctors and disregarded the hearing officer. Because there was evidence to support the conclusions of the Fund, the Court is obligated to sustain their decision.

Stock appeals.

## Discussion

At the outset, we note that the Board has moved to dismiss Stock's appeal on the basis that the statement of facts in his opening brief is unduly argumentative, and contains inadequate citations to the evidentiary record. We find, however, that Stock's brief contains a detailed statement of the facts, including the evidence contrary to his position, and includes specific citations to the administrative record where particular evidence appears. Even if the fact statement in Stock's brief was deficient in some respect, this would not justify dismissal of Stock's appeal, since "[w]e prefer . . . to reach the merits of every appeal that comes before us, if briefing deficiencies do not impede appellate review." *Witherspoon v. Thurmond*, 642 S.W.3d 784, 785 n. 1 (Mo. App. S.D. 2022) (citation omitted); *see also*, *e.g.*, *Hendrix v. City of St. Louis*, 636 S.W.3d 889, 898 (Mo. App. E.D. 2021) (Broniec, J.). The Board's motion to dismiss Stock's appeal is denied.

## I.

In his sole Point on appeal, Stock argues that the Board's denial of his application for duty-related disability benefits was "unsupported by competent and substantial evidence upon the whole record in that the Board erroneously credited the medical conclusions of two unqualified record reviewing retired physicians over the causation opinions of Petitioner's treating orthopedic surgeon

8

and independent medical evaluator." Stock essentially asks us to overturn the Board's decision to credit the expert medical causation opinions of Drs. JB and JC, rather than the contrary causation opinions of Drs. RFH, LM, and DV. Stock's argument is inconsistent with our standard of review.

In proceedings for judicial review of administrative decisions in contested cases, this Court reviews the decision of the agency, not the circuit court. *TAP Pharm. Prods. v. State Bd. of Pharm.,* 238 S.W.3d 140, 141 (Mo. 2007). Although § 536.140[2] provides seven grounds for review of an agency decision, Stock relies on only one: whether the agency's decision is supported by competent and substantial evidence on the record as a whole. § 536.140.2(3). Substantial evidence is "competent evidence that, if believed, has probative force upon the issues." *Walsh v. Mo. State Bd. of Nursing,* 689 S.W.3d 566, 569 (Mo. App. W.D. 2024). Competent evidence is relevant and admissible evidence that "is capable of establishing the fact in issue." *Knapp v. Mo. Loc. Gov't Emp. Ret. Sys.,* 738 S.W.2d 903, 913 (Mo. App. W.D. 1987). "We will only reverse in the rare case where the agency's decision is contrary to the overwhelming weight of the evidence." *M.F. by Fields v. Stringer,* 617 S.W.3d 868, 875 (Mo. App. E.D. 2021) (citing *State Bd. of Registration for Healing Arts v. McDonagh,* 123 S.W.3d 146, 152 (Mo. 2003)).

In determining whether an agency decision is supported by competent and substantial evidence, we will not second-guess the agency's credibility determinations. Although the court "considers the entire record to determine whether the decision is supported by competent and substantial evidence," a

---

[2] Unless otherwise indicated, statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated by the 2024 Cumulative Supplement.

9

reviewing court "must defer to the agency's determinations on the weight of the evidence and the credibility of witnesses." *Henry v. Mo. Dept. of Mental Health,* 351 S.W.3d 707, 712 (Mo. App. W.D. 2011) (cleaned up). "[W]hen the evidence before an administrative body would warrant either of two opposed findings, the reviewing court is bound by the administrative determination, and it is irrelevant that there is supportive evidence for the contrary finding." *Hornbeck v. Spectra Painting, Inc.,* 370 S.W.3d 624, 629 (Mo. 2012) (cleaned up); *see also Geen v. Mo. Dep't of Mental Health,* 694 S.W.3d 133, 135-36 (Mo. App. E.D. 2024).

Our deference to an agency's credibility determinations extends to the agency's assessment of expert testimony. Thus, where an administrative agency chooses between competing expert opinions concerning issues of medical causation, and those opinions are supported by the evidence, this Court will not reconsider the agency's choice of which expert opinion to believe. In worker's compensation cases in which the Labor and Industrial Relations Commission is charged with resolving similar disputes concerning workplace injuries, this Court has repeatedly stated that the choice between competing expert medical opinions is for the Commission, not a reviewing court:

> Acceptance or rejection of medical evidence is for the Commission to determine. When competing medical causation testimony is presented, it is generally the Commission's prerogative to choose which testimony to believe. The Commission is free to believe whatever expert it chooses as long as that expert's opinion is based on substantial and competent evidence. We will affirm the decision of the Commission to accept one of two conflicting medical opinions if that decision is supported by substantial and competent evidence.

*Comparato v. Lyn Flex West*, 611 S.W.3d 913, 921 (Mo. App. E.D. 2020) (cleaned up); *see also*, *e.g.*, *Kent v. NHC Healthcare*, 621 S.W.3d 596, 608 (Mo. App. E.D.

10

2021) ("'[t]he weight afforded to a medical expert's testimony is exclusively within the discretion of the Commission,' and where there is disagreement between medical experts 'the issue is peculiarly for the Commission's determination'" (citation omitted)). Although this is not a workers' compensation case, the same principle applies here: we will generally not overturn the Board's choice among competing expert medical opinions.

The City of Richmond Heights' Municipal Code, and the Board's Rules and Regulations, plainly give the Board the responsibility of determining whether an applicant is in fact disabled, and whether any disability is work related. The Municipal Code provides that Police or Fire Department employees who suffer a duty-related disability shall be paid a monthly pension out of the Policemen's and Firemen's Retirement Fund. Richmond Heights, Mo., Municipal Code, Tit. III, § 200.350 (2021). The Retirement Fund is under the exclusive management and control of the Fund's Board of Trustees. *Id.* at § 200.210(A)–(B). The Municipal Code also provides that "[t]he [Fund's] Board of Trustees shall determine whether a disability is duty caused and its decision shall be final and conclusive." *Id.* at § 200.350.C.

Chapter I(C) of the Board's Rules and Regulations provides:

> Before denying an application for disability retirement benefits, the Board shall obtain separate, written reports from three medical doctors wherein each renders an opinion as to whether the applicant is disabled, and if the issue is in question, whether his disability is duty related or non-duty related. The Board shall review these reports and render a decision. The members of the Board shall exercise their independent judgment and discretion on these issues.

Chapter I(D) of the Board's Rules and Regulations defines "disability," and sets forth standards for determining whether a disability is "duty related."

11

The term "disability" as used herein, means that applicant, despite reasonable accommodation, is permanently unable to perform his duties or the duties of any substantially similar position in their particular Department's service which is at the same rate of pay, if one exists.

A disability is "duty related" when an injury or illness attributable to applicants [sic] employment causes him to be disabled. For example, an applicant who despite duty or non-duty related prior injuries and/or illnesses, is able to perform his duties, who then sustains added injury or illness attributable to his duties, which renders him disabled, would be considered to have sustained a duty related disability, unless his pre-existing injuries and/or illnesses were primarily non-duty related.

As a contrary example, an applicant who was able to perform his duties despite suffering from significant pre-existing injury and/or illness, who is then rendered disabled by illness and/or injury not directly related to his duties, would not be considered to have sustained a duty related disability.

The Board's members "exercise[d] their independent judgment and discretion," as directed by Chapter I(C) of the Board's Rules and Regulations, when they determined "that Stock's fall on June 30, 2020 was not the cause of his permanent inability to perform his duties as a firefighter/paramedic." In doing so, the Board chose to credit the expert medical opinions of Drs. JB and JC over the contrary opinions of Drs. RFH, LM, and DV – as was the Board's prerogative. The opinions of Drs. JB and JC provide substantial evidence supporting the Board's conclusion that Stock's disability was caused by the severe osteoarthritis, and the significant negative ulnar variance, in his left wrist – not by his fall off a fire truck on June 30, 2020.

In challenging the Board's credibility determinations, Stock emphasizes factors which might arguably impact the weight or persuasiveness of the opinions expressed by Drs. JB and JC. Thus, Stock's briefing emphasizes: that Stock had

12

not experienced any symptoms of osteoarthritis or a negative ulnar variance prior to his June 2020 accident; that neither Dr. JB nor Dr. JC was a specialist in orthopedics; that neither personally examined Stock but both merely reviewed his medical records; that they relied on a radiologist's interpretation of Stock's MRIs, rather than reviewing and interpreting the MRI images themselves; and that neither Dr. JB nor Dr. JC was actively practicing. These were issues for the Board to weigh in determining the probative value of their opinions; these issues do not provide a basis for this Court to reverse the Board's decision to credit their opinions over those of Drs. RFH, LM, and DV.

> As a rule, questions regarding the sources and bases of expert witness testimony and opinions affect the weight, not the admissibility, of such evidence. The weight afforded a medical expert's opinion is exclusively within the discretion of the Commission.

*Watson v. Tuthill Corp.*, 672 S.W.3d 260, 266 (Mo. App. S.D. 2023) (cleaned up).

Notably, during the appeal hearing before the Board, Stock did not object to the admissibility of the causation opinions of Drs. JB and JC, on the basis that they were not sufficiently qualified, or that their opinions were otherwise unreliable. As the Board points out, "[q]uestions of whether the proffered expert opinion testimony is supported by a sufficient factual or scientific foundation are questions of admissibility and must be raised by a timely objection or motion to strike." *Brooks v. SSM Health Care*, 73 S.W.3d 686, 693–94 (Mo. App. S.D. 2002) (citation omitted). "'When any admissibility issue is waived by failure to object, the issue cannot be raised subsequently by arguing the lack of [or] sufficiency of the evidence to support a decision.'" *Snider v. Mo. Hwys. & Transp. Comm'n*, 356 S.W.3d 320, 324–25 (Mo. App. W.D. 2011) (citation

13

omitted).  A party cannot resurrect an admissibility objection it failed to make, by arguing that the evidence was insufficient to support a decision because the unchallenged evidence should be disregarded.  "'A party is not permitted to 'back-door' an issue relating to the admissibility of expert testimony under the guise of a sufficiency of the evidence argument.'" *Hartle v. Ozark Cable Contracting*, 291 S.W.3d 814, 817 (Mo. App. S.D. 2009); *see also Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 860 (Mo. 1993) ("we have found no case that permits a party to blissfully ignore the requirement to object to [expert opinion] evidence . . . and then 'back-door' the [admissibility] issues into the lawsuit under the guise of a sufficiency of evidence argument"); *Lacy v. Federal Mogul*, 278 S.W.3d 691, 700 (Mo. App. S.D. 2009) (worker's compensation proceeding adjudicated before the Labor and Industrial Relations Commission).

At oral argument, Stock's counsel contended that, under the Board's procedures, he could not have objected to the opinion testimony of Drs. JB and JC, but could only cross-examine them to highlight purported weaknesses in their qualifications or the bases for their opinions.  We disagree.  Chapter II(B) of the Board's Rules and Regulations specifically provides that "[a]ll hearings before the Board shall be conducted according to the provisions of Chapter 536 RSMo, the Missouri Administrative Procedure Act, applicable to contested cases, specifically Section 536.010(1)(2)(3)(4)(d) [*sic*] RSMo and Sections 536.063 through 536.140 RSMo."  The Missouri Supreme Court has specifically held that the standards for admissibility of expert testimony in § 490.065 apply in contested administrative hearings:

> Cases brought before administrative agencies generally are less formal and structured than are civil proceedings in the circuit

courts. That does not mean that evidentiary rules developed in civil cases have no application to administrative actions, however.

. . . .

. . . While contested administrative proceedings are not required to follow the "technical rules of evidence," the "fundamental rules of evidence" applicable to civil cases also are applicable in such administrative hearings. The standards for admission of expert testimony constitute such a fundamental rule of evidence. The standards set out in section 490.065 therefore guide the admission of expert testimony in contested case administrative proceedings such as this one.

*State Bd. of Registration for Healing Arts v. McDonagh*, 123 S.W.3d 146, 154–55 (Mo. 2003) (citation omitted); *accord*, *Stone v. Mo. Dept. of Health & Sr. Servs.*, 350 S.W.3d 14, 21 (Mo. 2011).

The statutes incorporated by reference into the Board's Rules and Regulations plainly contemplate that parties may make evidentiary objections during contested case hearings. Indeed, the relevant statutes provide that "[a]ny evidence received without objection which has probative value shall be considered by the agency along with the other evidence in the case." § 536.070(8); *see also* § 536.070(7) (providing for the preservation of a record with respect to "[e]vidence to which an objection is sustained"). Stock was entitled to object to the opinion testimony of Drs. JC and JB if he believed their testimony was incompetent; having failed to do so, he cannot repackage an unpreserved competency objection as a challenge to the sufficiency of the evidence. Because Stock did not object to the admissibility of the causation opinions offered by Drs. JB and JC, their opinions were part of the evidentiary record, on which the Board could rely in making its decision.

15

Substantial evidence supported the Board's decision to credit the causation opinions of Drs. JC and JB, rather than the contrary opinions of Drs. RFH, LM, and DV. Every physician agreed that the four MRI studies of Stock's left wrist showed the he had a congenital negative ulnar variance and some level of osteoarthritis. While the medical experts provided conflicting testimony as to whether Stock's ulnar variance and/or osteoarthritis caused his pain and resulting disability, Drs. JC and JB both opined that Stock's pain was not from the injuries sustained in his fall.

The Board did not ignore the contrary medical testimony. Instead, the Board specifically found that the opinions "of those physicians who discounted the existence of the negative ulnar variance and severe osteoarthritis is less credible and reliable than those who took the presence of these significant pre-existing and long-term conditions into account." Substantial evidence supported this credibility determination. The MRIs and physician reports indicate that Dr. RFH had successfully repaired the TFCC tear which was the immediate consequence of Stock's June 2020 accident. This successful surgical repair calls into question the opinions of those physicians who opined that the June 2020 accident was the cause of Stock's disability in the Fall of 2021. Moreover, Dr. RFH acknowledged that Stock's negative ulnar variance was "more severe than what we typically see," and that Stock was the only patient he had ever had who was worse off after surgical repair of a TFCC tear – all of which suggests that it was the pre-existing condition of Stock's left wrist, rather than the traumatic injury he suffered in June 2020, which caused his ongoing pain and disability. Dr. RFH's treatment notes indicate that he could not determine the cause of

16

Stock's ongoing pain subsequent to June 2021, given that the surgical repair appeared to have been successful – a statement which is inconsistent with his later testimony that Stock's disability was caused by his June 2020 fall.

Substantial evidence supported the Board's determination that Stock's disability was not caused by a workplace injury.

**II.**

On appeal, Stock challenges only the Board's decision to credit the medical causation opinions of Drs. JC and JB, over the contrary opinions of Drs. RFH, LM, and DV. Stock does not argue that he was entitled to duty-related disability benefits, even if the Board's credibility determinations are accepted. Thus, Stock effectively concedes that, if the Board was entitled to rely on the medical causation opinions of Drs. JC and JB, that would justify the denial of his application for duty-related benefits.

Stock does not raise any issue concerning the causation standard which applies in determining whether a particular firefighter's disability is duty related. Nevertheless, it became evident during the briefing and argument in this appeal that the Board's Rules and Regulations are ambiguous, and arguably internally inconsistent, concerning what level of causal connection is required between a workplace injury and a firefighter's resulting disability.

Chapter I(D) of the Board's Rules and Regulations states that a disability is duty related where a work-related injury "causes" the disability. The bare requirement of a causal connection between the workplace injury and a resulting disability does not clearly define what *degree* of causal relationship is required, however.

17

Missouri law recognizes a variety of levels of causation. Thus, in negligence cases, a plaintiff must prove that a defendant's actions were both the *actual cause* of the plaintiff's injuries (meaning, the "but for" cause), but also that the defendant's actions were the *proximate cause* (meaning that "'the injury must be a reasonable and probable consequence of the act or omission of the defendant'"). *Tharp v. St. Luke's Surgicenter-Lee's Summit, LLC*, 587 S.W.3d 647, 657 (Mo. 2019) (citation omitted). Moreover, negligence cases recognize that there may be more than one cause of an injury: "'[t]wo causes that combine'" can <u>each</u> constitute a "but for" cause. *Harvey v. Washington*, 95 S.W.3d 93, 96 (Mo. 2003) (quoting *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 862 (Mo. 1993)); *see also*, *e.g.*, *Hensley v. Jackson County*, 227 S.W.3d 491, 496 (Mo. 2007) ("'The negligence of the defendant need not be the sole cause of the injury, as long as it is one of the efficient causes thereof, without which injury would not have resulted.'" (citation omitted)).

Missouri law has applied different causation standards in employment discrimination cases at various times. Missouri courts previously applied a "contributing factor" causation standard in cases brought under the Missouri Human Rights Act, *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 820 (Mo. 2007), under which a plaintiff was required to prove only that a protected characteristic or activity was "'a factor that contributed a share in anything or ha[d] a part in producing the effect.'" *Bram v. AT&T Mobility Servs., LLC*, 564 S.W.3d 787, 796 (Mo. App. W.D. 2018) (citation omitted). The Human Rights Act was amended in 2017 to abandon this "contributing factor" standard; the statute now requires that "the protected criterion was the motivating factor" for a

plaintiff to prove an MHRA claim. S.B. 43, 99th Gen. Assembly, 1st Reg. Sess., 2017 Mo. Laws 410, 411, 421, codified at §§ 213.010(2), 213.101.4.

Perhaps most relevant, Missouri law has, over time, applied differing causation standards in worker's compensation cases. The determinations which the Board makes, as to whether a particular disability is duty or non-duty related, are similar to the causation determinations required in worker's compensation cases. Prior to 1993, worker's compensation caselaw held that "[t]he work of the employee does not have to be the sole or even the primary cause of the injury; it must only be a contributing factor to the injury." *Avery v. City of Columbia*, 966 S.W.2d 315, 322 (Mo. App. W.D. 1998) (citing *Rector v. City of Springfield*, 820 S.W.2d 639, 642 (Mo. App. S.D. 1991)). In 1993, the General Assembly amended the Worker's Compensation Law, to provide that an injury was compensable only "if work was a substantial factor in the cause of the resulting medical condition or disability"; the legislature specified that this standard would not be satisfied "merely because work was a triggering or precipitating factor." S.B. No. 251, 87th Gen. Assembly, 1st Reg. Sess., 1993 Mo. Laws 763, 766, codified at § 287.020.2, RSMo 2000. The relevant definitions were amended again in 2005; today, the statute requires that "[a]n injury by accident is compensable only if the accident was the prevailing factor in causing both the resulting medical condition and disability," with "prevailing factor" defined to mean "the primary factor, in relation to any other factor, causing both the resulting medical condition and disability." § 287.020.3(1).

Given the variety of causation standards recognized in Missouri law, the simple statement in Chapter I(D), that a firefighter is entitled to duty-related

19

benefits when a work-related injury "causes" disability, does not unambiguously adopt a specific causation standard. The remainder of Chapter I(D) provides no additional clarity. The regulation states that a firefighter with pre-existing injuries may nonetheless be entitled to duty-related benefits *if* a later work-related injury "renders him disabled." The regulation goes on to say, however, that a firefighter would be disqualified from receiving duty-related disability benefits if "his pre-existing injuries and/or illnesses were primarily non-duty related." The disqualification provision says nothing about the relative causal contribution made by the firefighter's pre-existing conditions, as compared to a workplace injury. Instead, the mere *existence* of a pre-existing and non-work-related injury appears to be disqualifying, even if that pre-existing condition played no, or only a limited, role in causing later disability.

The confusion concerning the appropriate causation standard was highlighted during oral argument. As we have described above, Dr. JC opined that Stock's osteoarthritis was the "major causal factor" producing his pain and resulting disability, while Dr. JB stated that Stock's workplace injuries were "not causative" of his disability. Thus, Drs. JC and JB's opinions would support the conclusion that non-duty-related conditions were the primary, if not the exclusive, cause of Stock's disability. Despite this, at oral argument the Board's counsel contended that the Board could deny Stock's application for duty-related disability benefits, so long as the non-work-related conditions were "a contributing cause," which "contribute[d]" "in any degree" to Stock's disability. The Board's counsel was unable to identify any language in the Board's Rules and Regulations which adopts a "contributing cause" standard for pre-existing, non-

20

work-related conditions, while apparently adopting a *more stringent* causation standard for work-related injuries.

Given the arguments Stock makes on appeal, we need not decide what causation standard(s) should apply to the determination whether a firefighter is entitled to duty-related disability retirement benefits. Nevertheless, we strongly encourage the Board to revisit its regulations, to provide greater clarity concerning the causal relationship required between a work-related injury and a firefighter's subsequent disability, particularly where the firefighter has pre-existing medical conditions.

## Conclusion

The Board's motion to dismiss Stock's appeal is denied. Because the Board's decision is supported by competent and substantial evidence on the record as a whole, the circuit court did not err in refusing to set the Board's decision aside. The judgment of the circuit court is affirmed.

_____
Alok Ahuja, Judge

All concur.